Mr. Chief Justice TANEY
delivered the opinion of the court.
This case has arisen out of the unfortunate political differences which agitated the people of Rhode Island in 1841 and 1842.
It is an action of trespass brought by Martin Luther, the plaintiff in error, against Luther M. Borden and others, the defendants, in the Circuit Court of the United States for the District of Rhode Island, for breaking and entering the plaintiff’s house. The defendants justify upon the ground that large numbers of men were assembled in different parts of the State for the purpose of overthrowing the government' by military force, and were actually levying war upon the State; that, in order to defend itself from this insurrection, the State was declared by competent authority to be under martial law ; that the plaintiff was engaged in the insurrection; and that the defendants, being in the military service of the State, by command of their superior officer, broke and entered the house and searched the rooms for the plaintiff, who'was supposed to be there concealed, in order to arrest him, doing as little damage as possible. The plaintiff replied, that the trespass was committed by.the. defendants of their own proper wrong, and without any such cause; and upon the issue joined on this replication, the parties proceeded to trial.
The evidence offered by the plaintiff and the defendants is *35 stated at large in the record; and the questions decided by the Circuit Court, and brought qp by the writ of error, are not such as commonly arise in an action of trespass. The existence and authority of the/ government under which the defendants acted was called in question; and the plaintiff insists, that, before the acts complained of were committed, that government had been displaced and annulled by the people of Rhode Isl- and, and that the plaintiff was engaged in supporting the lawful authority of the State, and the defendants themselves were in arms against it.
This is a new question in this court, and certainly a very grave one; and at the time when the trespass is alleged to have been committed it had produced a general and painful excitement in the State, and threatened to end in bloodshed and civil war.
The evidence shows that the defendants, in breaking into the plaintiff’s house and endeavouring to arrest him, as stated in the pleadings, acted under the authority of the government which was established in Rhode Island at the time of the Declaration of Independence, and which is usually called the charter gov-eminent. For when the separation from England took place, Rhode Island did not, like the other States, adopt a new constitution, but continued the form of government established by the charter of Charles the Second in 1663; making only such alterations, by acts of the legislature, as were necessary to adapt it to their condition and rights as an independent State. It was under this form of government that Rhode IslantJ united with the other Statés in the Declaration of Independence, and afterwards ratified the Constitution of the United States and became a member of this Union; and it continued to be the established and unquestioned government of the State until the difficulties took place which have given rise to this action.
In this form of government no mode of proceeding was pointed out by which ameñdments might be made. . It authorized the legislature to prescribe the qualification of voters, and in the exercise of this power the right of suffrage was confined to freeholders, until the adoption of the constitution of 1843.
For some years previous to the disturbances of which we are^ now speaking, many of the citizens became dissatisfied witlT the charter government, and particularly with the restriction upon the right of suffrage. Memorials were addressed to the legislature- upon this subject, urging the justice and necessity of a more liberal and extended rule. But they failed to produce the desired effect. And thereupon meetings were held and associations, formed by those who were in favor of a maro extended right of soffrage.,which finally resulted in the election *36 of a convention to form a new constitution to ho submitted to the people for their adoption or rejection.. This convention was not authorized by any law of the' existing government. It was elected at voluntary meetings, and by those citizens only who favoréd this ■ plan of reform; those who were opposed to it, or opposed, to the manner ip which it was proposed to be accomplished, taking no part in the proceedings. The persons chosen as above mentioned came, together and framed a constitution, by which the right of suffrage was extended to every male citizen of twenty-one years of age, who had resided in the State for one year, and in the town in which he offered to vote for six months, next preceding the election- The convention also prescribed the manner in which this constitution should be submitted to the decision of the people, — permitting every one to vote on that question who was an American citizen, twenty-one years old, and who had a permanent residence or home in the State, and directing the votes to be returned to the convention.
Upon the return of the votes, the' convention declared that the constitution was adopted and . ratified by a majority of the people of the State, and was the paramount law and constitution of Rhode Island. And it communicated this décision to the governor under the charter government, for the purpose of being laid before the legislature; and directed .elections to be held for a governor, members of the legislature, and other officers under the new constitution. These elections accordingly took plaee, and the governor, lieutenant-governor, secretary of state, and senators and representatives thus appointed assembled at the city of Providence On May 3d, 1842, and immediately proceeded to organize the new government, by appointing the officers and passing the. laws necessary for that purpose.
The charter government did not, however,. admit the validity of these proceedings, nor acquiesce in them. On the contrary, in January, 1842, when this new constitution was communicated to the governor, and by him laid before the legislature, it passed resolutions declaring all acts done for the purpose of imposing that constitution upon the State to be an assumption ot the powers of government, in violation of the andJ, nat n would maxntam its authority anddel'end tlwPlegal and constitutional rights of the peopled ~~
iirsdopting this measure, as well as in all others taken by the charter government to assert its authority, it was supported by a large number of the citizens of the State, claiming to be a majority, who regarded the proceedings of the adverse party as *37 unlawful and disorganizing, and maintained that, as the existing government had been established by the people of the State, no convention to frame a new constitution could be called without its sanction; and that the times and places of taking the votes, and the officers to receive them, and the qualification of the voters, must be previously regulated and appointed by law.
But, notwithstanding the détermination of the charter government, arid of those who. adhered to it, to maintain its authority, Thomas W. Dorr, who had been elected governor under the new constitution., prepared to assert the authority of that government by forcé, and many citizens assembled in arms to support him. The charter government thereupon passed an act declaring the State under martial IawTand at the same time proceeded to call out, the militia, to repel, the threatened-attack and. to subdue those who were engaged in it.. In this state of the contest, the house of the plaintiff, who was engaged in supporting the authority of the new government, was broken and entered in order to arrest him. The defendants were, át the time, in the’ military service of the old government, and in arms to support its authority.
It appears, also, that the charter government at its session of January, 1842,_took measures to call a convention to revise the existing form of government; and after various proceedings; which it is not material to state, a new constitution was formed by a convention elected under the authority of the charteiT government, and afterwards adopted and ratified by the people; the times and places at which trie votes were to he given, the persons who were to receive and return them, and the qualification of the voters, having all been previously authorized and provided for by law passed by the charter government. This new government went into operation in May, 1843, at which time the old government formally surrendered all its powers ; and this constitution has continued ever since to be tne admitted and estahiisbpfl gnwrnment of'Rhode Island:---‘—
•The difficulties with the government of which Mr. Dorr' was the head were soon over. They had ceased before the cori-stitution was framed by the convention elected by the authority of. the charter government. For after an unsuccessful attempt made by Mr. Dorr in Ma^, 1842, at the head of a military force, to get possession of the State arsenal at Providence;, in which he was repulsed, and an assemblage of some hundreds of armed men under his command at Chepatchet in the June following, which dis >ersed upon the approach of the troops of the old government, no further effort'was made to establish it; and until the constitution of 1843 went iiTttrrrpera— tiomfhe. charter government continued to assert its authority *38 and exercise its powers, and ..tn-^enforce obedience .^throughout the State, arresting and imprisoning, and punishing in its lüdi-cial tribunals, those who had appeared in arms .against it.
Wmio not understand from the argument that the constitution under ■which the plaintiff acted is supposed to have been in force after the constitution of May, 1843, went into operation. The contest is confined to the year preceding. The plain* tiff" contends that .the charter government was displaced, afid ceasécftohhyeanv lawful power, alter the organization, in May, 1844¿. oí the government which he supported, and although thaUgovernmenc never was able _to_ exercise any authority-in the State, nor to command obedience to its laws or .to its officers yet Tjé~rnRÍKts that, it. was thelawiul and established govern nTent^npan^ftfa^gEaMnd — that it was ratified by a large ma-■forifyTffthe male people-jo£-the_State of the age of twenty-one and upwards, and also by a majority of those who were en~ titled to vote for yon eral officer~slimder”theTKeti .existing laws of-the-Siate. The fact that it was so ratified was not admitted ; and at the trial in the Circuit Court he offered to prove it hy the production of the original ballots, and the original registers of-the persbns voting, verified by the oaths of the several moderators and clerks of the meetings, and by the testimony of all the persons so voting, and by the said constitution ; and also offered in evidence, for the same purpose, that part of the census of the United States for the year 1840 which applies to Rhode Island ; and a certificate, of the secretary of state of the charter government, showing the number of votes polled by the freemen of the State for the ten years then last past.
The Circuit. Court rejected this evidence, and instructed the jury tha^ the charter government and laws under which the defendants acted were, at the time the trespass is alleged to have been committed, in full force and effect as the form of government and paramount law of the StateT'and constituted a justification of the acts of the defendants as set forth in their pleas. " ' ' " " ' “■
ItiFtETs opinion of the Circuit Court that we are now called upon to review. It is set forth more;at large in the exception, but is in substance as above stated; and the question presented is certainly a very serious one: For, if this court_ig,. authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned, —if it had been annulled by the adoption of the opposing government, — then the laws passed by its legislature during that time were nullities; its taxes wrongfully collected; its salaries and com *39 pensation to its officers illegally paid; its public accounts improperly settled; and the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals.
When ,the decision of this court might lead to such results,. it becomes its duty to examine very carefully,its_own powers before- it_undertakes to_exercise jurisdiction.
Cértainly, the question which the plaintiff proposed to raise by the testimony ne eneren nas not heretoiore been retyrgrriyad-as a In. forming the
constitutions of the different States, after the Declaration of Independence, and in the various changes and alterations which have since been made, the political department has always de-_. termined whether the proposed constitution or amendment was ‘ ratified or not by the people of the State — and-4he~Turl'LciaI power has followed its iecigion.. In Rhode Island, the question has been directly decided. .Prosecutions were there instituted against some of the persons who had been active in the forcible opposition to the old government. And in more than one of. the cases, evidence was offered on the part of the defence similar to the testimony offered in the Circuit Court, and for the samé purpose ; that is, for the purpose of showing that the proposed constitution had been adopted by the people of Rhode Island, and had, therefore, become the established. government, and consequently that the parties accused were doing nothing more than their duty in endeavouring to support- it.
But the courts uniformly held that the inquiry proposed to be made belonged to the political power and not to the judicial'; that it rested with the political power to decide whether the charter government had been displaced or not; and when . that decision was made, the judicial department would be hmmrj t.o take notice of it as the paramounfTaw of the State,'' without the aid of oral evidence o ttiPPiraminatinn nf wit, nesses; that, according to the law;s and institutions of Rhode Island, no such change had been recognized by the political power; and that the charter government was the lawful and established government of the State during the period in con-■''fest, and that those who were in arms against it were insurgents, and liable to punishment. This doctrine is clearly and forcibly stated in the opinion of the Supreme Court of the State in the trial of Thomas W. Dorr, who was the governor elected under the opposing constitution, and headed the armed force which endeavoured to maintain its authority
Indeed, we do not see how the question could be tried and *40 judicially decided in a State court. Judicial power presup'poses an established- government capable of .enacting laws and enforcing their exeoution.'and of appointing judges to expound and* administer them. The acceptance of the judicial office is a recognition of the authority of t.he government, from which it is .derived. And- if- the authority of that government is annulled and overthrown, the power of its courts and other officers is annulled with it. And if a State court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to be a court, and be incapable of pronouncing a judicial decision upon the rpiestionJ-t undertook to_trv. Tf it decides at all as a'court, it necessarily affirms the existence and authority of the government under which it is exercising judicial power.
It is worthy of remark, however, when we are referring to the.authority of State decisions, that the trial of Thomas W. Dorr took place after the constitution of 1843 went into operation. The judges who decided that case held their authority under that constitution; and it is admitted on all hands that it was adopted by the people of the State, and is the. lawful and established government. It is the decision, therefore, of a State court, whose judicial authority to decide upon the constitution and laws of Rhode Island is not questioned by either, party to this controversy, although the government under which it acted was framed and adopted under the sanction and laws of the charter government.
The point, then, raised here has been already decided by the courts of Rhode Island. The question relates, altogether, to the constitution and laws of that State ; and the well settled rule in this court is, that the courts of the United States adopt and follow the decisions of the State courts in questions which concern-merely. the constitution and laws of thejState
Upon what ground could the Circuit Court oTthe United States which tried this case have departed from this rule, and disregarded and overruled the decisions of the courts of Rhode Island? Undoubtedly the courts of the United States-have certain powers under the Constitution and-Jaws^of-the-United States which do not belong t,o*'the-State courts. Butthe power of determining that a State government has beén^law-fully established, which the courts of the State disown and repudiate, is not one of them. IJpon sucliaquestion the courts of the United States' are bound tcTToHow the decisions of the State tribunals! and must therefore regard the charter government as the lawful and established government during the time of this contest. * """- ‘
*41 Besides, if the Circuit Court had entered upon this inquiry, by ■what rule could it have determined the qualification of voters upon the adoption or rejection of the proposed constitution, unless there was some previous law of the State to guide it ? It is the province of a court to expound the law, not to make it.' And certainly it is no part of the judicial-functions of any court of the United States to. prescribe the qualification of voters in a State, giving the right t'o those to whom it is denied by the written and established constitution and laws of the State, or taking it away from those to whom it is given; nor has it the right to determine what political privileges the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision./
And-if the then existing law of Rhodc/Island which confined the right of suffrage to freeholders is to govern, and this question is to be tried by that rule, how could the majority have been ascertained by legal evidence, such as a court of justice might lawfully receive ? The written returns of the moderators and clerks of mere voluntary meetings, verified by affidavit, certainly would not be admissible; nor their opinions or judgments as to the freehold qualification of the persons who voted. The law requires actual knowledge in the witness of the fact ip which he testifies in a court of justice. How, then, could the rqajority of .freeholders have been determined in a judicial proceeding ?
The- court, had not the power to order a census of the freeholders to be taken; nor would the census of the United States of 1840 be any evidence of the number of freeholders in the State in 1842. Nor could the court appoint persons to examine and determine whether- every, -person who had voted possessed the freehold qualification which the law then required. ' In the nature of things, the Circuit Court could not know the name and residence of every citizen, and bring him before the court to be examined. Arid if this were attempted, where would such an inquiry have. terminated ? And how long must the people of Rhode Island have waited to learn from this court under what form of government they were living during the year in controversy ?
But this is not all. The question ■ as to the majority is a question of fact. It depends Upon the testimony of witnesses, and if the testimony offered by the plaintiff had been received, the defendants had the right to offer evidence to rebut it} and there might, and probably would, have been conflicting testimony as to the number of voters- in the State, and as to the legal qualifications of many of the individuals who had voted. The decision would, therefore, have depended upon the rela *42 tive credibility of- -witnesses, and the weight of testimony; and as the casé before the Circuit Court was an action at common law, the question of fact, according to the seventh amendment to the Constitution of the United States, must have been tried by the jury. In one case a jury might find that the constitution which the plaintiff supported was adopted by a majority of the citizens of the State,, or of the voters entitled to vote by the existing law. Another jury in another case might find otherwise. And as a verdict is not evidence in a suit between different parties, if the courts of the United States have the jurisdiction contended for by the plaintiff, the question whether the acts done under the charter government during the period in contest are valid or- not must always remain unsettled and opeji to dispute. The authority and security of the State governments do not rest on such unstable foundations.
Moreover, the Constitution of the United States, as far' as it has provided tor an emergency of this kind, and authorized the general government to interfere in tne domestic concerns ~of a State, has treated the subject as -political in~its natureTand placed the nower m the hands of that department.
-"v The fourth section of the fourth article of the Constitutionof the United States provides that the United States shall guarantee to every State in the Union a republican form of government, and shall protect each of them against invasion; and on the application of the legislature or of the executive (when the legislature cannot be convened) against domestic violence. Under this article of the Constitution it rests with Congress to decide"what government is the established one in a State. For -gsttorUmted States guarantee to each~Sfafe a republican government. Congress must necessarily decide what government is established in the State before it can determine whether it is republican oiTrEot And.when~the senators "and representatives'Of a State are admitted into the councils of the Union,~tholTuthority of the government imder which they are appointedTas well as its republican character, is recognized by--the-pfoper constitutional authority. Anfftts~d5cision'is"binding on every other department of the government, and couk not be questioned in a judicial tribunal. It is true that the cm .test in this case did not last long enough to bring the mat;or -to this issue ; and as no senators or representatives were elected under the authority of the government of which Mr. Dorr was the head,- Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in' the courts.
So, too, as relates to -the clause in the above-mentioned article of the Constitution, providing for cases of domestic violence. *43 It rested with Congress, too, to determine upon the means proper to be adopted to fulfil this guarantee. They might, if they had deemed it most advisable to do so, have placed it in the power of a court to decide when the contingency had happened which required the federal government to interfere. But Congress thought otherwise, and no doubt wisely; and by-the act of February 28, 1795, provided, that, “ in case of an insurrection .in any State against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such State or of the executive (when the legislature cannot be convened), to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress such.insurrection.”
By this act, the power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President. He is to act upon the application of the legislature or of the executive, and consequently he must determine what body of men constitute the legislature, and who is the governor, before he can act. The fact that both parties claim the right to the, government cannot alter the case, for both cannot be entitled to it. If t..iere is an armed conflict, like the one of which we are speak-, ing, it is a case of domestic violence, and one of the parties must be in insurrection against the lawful government. And the President .must, of necessity, decide which is the government, and which party is unlawfully arrayed against it, before he can perform the duty imposed upon him by the act of Congress.
After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right ? Could the court, while the parties were actually contending in arms for the.possession of the government, call witnesses before it and inquire which party represented a majority of the people ? If it could, then it would become the duty of the court (provided it came to the conclusion that the President had decided incorrectly) to discharge those who were arrested or detained by the. troops in the service of the United States or the government which the President was endeavouring to maintain. If the judicial power extends soJhx^-the guarantee.. contained in the (Jonstiñítimi-of the United States is a guarantee of anarchy, and not of order. Yet ifthis right doesTioTresicie in The, courts when the conflict is raging, if thppñhcial power is at that time bound to follow the, decision_Qf the political, it must be equally bound wheiT~ the contest is overi It cannot, when peace is restored, punish as offences and crimes the acts which it before recognized, and was bound to recognize, as lawful.
*44 It is true that in this case the militia were not called out by the President. But upon the application of the governor under the charter government, the President recognized him as the executive power of the State, and took measures to call out the militia to support his authority if it should be found necessary for the general government to interfere; and it is admitted in the argument, that it was the knowledge of this decision that put an end to the armed opposition to the charter government, and prevented any further efforts to establish by force the proposed constitution.. The interference of the President, therefore, by announcing his. determination, was as effectual as if the militia had been assembled under his orders. And it should be equally authoritative. Tor certainly no court of the United States, with a knowledge of this decision, would have been justified in recognizing the opposing party as the lawful government; or in treating as wrongdoers or insurgents . the officers of the governihent which the President had' recognized/and was prepared to support by an armed force. In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice. And this principle has been applied by the act of Congress to the sovereign States of the Union.
It' is said that this power in the President is dangerous to liberty, and may be abused. All power may be abused if. placed in unworthy hands. But it would be difficult, we think, to point out any other hands in which this power would be more safe, arid at the same time equally effectual. When citizens of the same State are in arms against each other, and the constituted authorities unable to execute the laws, the interposition of the United States must be prompt, or it is of little value. The ordinary course of proceedings in courts of justice would be utterly unfit for the crisis. And the elevated office of the President, chosen as he is by the people of the United ■States, and the high responsibility he could not fail to feel when acting in a case of so much moment, appear to furnish as strong safeguards against a wilful abuse of power as human prudence and foresight could well provide. At all events, it is conferred upon him' by the Constitution and laws of the United States,, and must therefore be resDected and enforced in its judicial tribunals.
. A question very similar to this arose in the case of Martin v. Mott, 12 Wheat. 29-31. The first clause of the first section of the act of February 28, 1795, of which we have been speaking, authorizes the President to call out the militia to repel in-vasión. It is the second clause in the same, section which authorizes the call to suppress an insurrection against a Slate *45 government. The power given tp - the President in each case is the same, — with this ■ difference only, that it cannot be exercised by him in the latter case, except upon the application of the legislature or executive of the State. The case above mentioned arose out of a call made by the President, by virtue of the power conferred by the first clause ; and the court' said, that, “ whenever a statute gives a discretionary power tó any person to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts.” The grounds upon which that opinion is-maintained-are set forth' in the report, and we think are conclusive. The same principle applies to the case how before the court.. .Undoubtedly, rf the President in exercising this power shall fall into error, or invade the rights of. the people of the State, it would be in the power of Congress to apply the proper remedy. But the courts must administer the law as they find it.f
The remaining question is whether the defendants, acting under military-orders issued under the authority of the government, were justified in breaking and entering the plaintiff’s house. In relation to the act of the legislature declaring martial law, it is not necessary in the case before us to inquire to what extent, nor under what circumstances, that power may be exercised by a State. Unquestionably a military government, established as the permanent government of the State, would' not be a republican government, and it would be ttie duty of Congress to overthrow it,. . But the- law of "Rhode"Island evidently contemplated no such..government. It whs intended merelyTdr the crisis, and to meet the peril in which the existing government was placed by the armed resistance to its authority. It was so understood and construed by the State, authorities. And, unquestionably, a State may use its military power to put down an armed insurrection, too strong to be controlled by the civil authority. The power is essential to the existence of every government, essential to the preservation of order and free institutions, and is as necessary to the States of this Union as to any other- government. The State itself must determine what degree of-force the crisis demands. Andif the government, of Rhode Island deemed the armed opposition so formidable, and so ramified throughout^ the Stqt.e, as to require the use of its military force and the~deciara-' tion of martial law, we see no ground unon which this court can question its authority. It was a state of war; and the established government resorted to the rights and- usages of war to maintain itself, and to overcome the unlawful opposition. And •in that state of things the officers engaged in its military ser *46 vice might lawfully arrest any one, who, from the .information before them, they had reasonable grounds to believe was engaged in the insurrection; and might ■ order a house to be forcibly entered and searched, when- there were reasonable grounds for supposing he might be there concealed. Without thq power to do this, martial law and the military array of the government would be mere parade, and rather encourage attack than repel it. No more force, however, can be used than is necessary to accomplish the object. -And if the. power is exercised for the purposes of oppression, or any injury wilfully done to person or property; the party by whom, or by whose order, it is committed would undoubtedly be answerable.
We forbear to remark upon the cases referred to in the argument, in relation to the commissions anciently issued by the kings of England to commissioners, to proceed against certain descriptions of persons in certain places by the law martial. These commissions were issued by the king at his pleasure, without the concurrence or authority of Parliament, and were often abused for the most despotic and oppressive purposes. They were used before the regal power of England was well defined, and were finally abolished and prohibited by the peti-' tion of right in the reign of Charles the First. But they bear no analogy in any respect to the declaration of martial law by the legislative authority of the~State, made for the purposes of self-defence, when assailed by an armed force; and the cases and commentaries concerning these commissions cannot, therefore, influence the construction of the Rhode Island law, nor furnish any test of the lawfulness of the authority exercised by the government.
' Upon the whole, we see -no reason for disturbing the judgment of the Circuit Court. The admission of evidence to prove that the charter government was the established government of the State was.an irregularity, but is not material to the judgment. - A Circuit Court of the United States sitting in Rhode Island is presumed" to know, the constitution and law of the State. And in order to make up its opinion upon that subject, it seeks information from any authentic and available source, without waiting for the formal introduction of testimony to prove- it, and' without- confining itself to the process which the parties mar^ offer. But this error of the- Circuit Court does not affect the result. For whether this evidence was or was not received, the Circuit Court, for the reasons herein before stated, was bound to recognize that government as the paramount ,and established authority of the State.
Much of the argument on the part of the plaintiff turned upon political rights and political questions, upon which the *47 court has been urged to express an opinion. ‘We decline doing so. The high power has been conferred on this court of. passing judgment upon the acts of the State sovereignties, and of the legislative and executive branches of the federal government, and of determining whether they are beyond the limits of power marked out for them, respectively by the Constitution of the United States. This tribunal, therefore, should be the last to overstep the boundaries which limit its own jurisdiction.' And while it should always be ready to meet any question confided to it by the Constitution, it is equally its duty' not to pass beyond its appropriate sphere of action, and to take care not to involve itself in discussions which properly belong to other forums. No one, we believe, has ever doubted the, proposition, that, according to the institutions of this country, the sovereignty in every State resides in the people of the State, and that they may alter and "change their form of government at tneir own pleasure"; But whether they have changed it or not by abolishing an old government, and establishing a new one in its place, is a question to be settled by the political power. And when that power has decided, the courts are bound to take notice of its decision, and to follow it.
The judgment of the Circuit Court must therefore be affirmed.
Rachel Luther v. Luther M. Borden et al.
Mr. Chief Justice TANEY
delivered the opinion of the court. This case has been sent here under a certificate of division from the Circuit Court for the District of. Rhode Island. It appears, on the face of the record^ that the. division was merely formal, and that the whole case has been transferred to this court, and a multitude of points (twenty-nine in number) presented for its decision. We have repeatedly decided that this mode of proceeding is not warranted by' the act of Congress, authorizing the justices of a Circuit Court to certify to the Supreme Court a question of law which arose at the trial, and upon which they differed in opinion. And many cases in which, like the present one, the whole case was certified, have been dismissed for want of jurisdiction. The same disposition must be made of this! The material points, however, have been decided in the case of Martin Luther against the same defendants, in which the opinion of this court' has been just delivered, and which was regularly brought up by writ of error upon the judgment of the Circuit Court. The case before us depends mainly upon the same principles, and, indeed, grew out of the same transaction; and the parties will understand the *48 judgment of this court upon all the material points certified, . from the opinion it has already given in ihe case referred to.
This case is removed to the Circuit Court.
Martin Luther v. Luther M. Borden et au.