Harry BROWN, Plaintiff,

v.

The STATE ELECTION BOARD of the State of Oklahoma, Clee Fitzgerald, Chairman, Herbert F. Hewett, Vice Chairman, and Leo Winters, Secretary, Defendants.

No. 39930.

Supreme Court of Oklahoma.

Feb. 13, 1962.

Rehearing Denied Feb. 19, 1962.

Jack P. Trezise, Midwest City, Wendell Wightman and Patrick Brown, Oklahoma City, for plaintiff.

John E. Wagner, Oklahoma City, Robert W. Blackstock, Bristow, for defendants.

J. Howard Edmondson, Governor, Oklahoma City, amicus curiae, Norman E. Reynolds, Jr., Oklahoma City, of counsel.

Leon S. Hirsh, James C. Harkin, Paul Johanning, Oklahoma City, amici curiae for Senator Walt Allen and others.

Sid White, Oklahoma City, amicus curiae.

JACKSON, Justice.

This action is precipitated by a so-called "policy statement" issued by the State Election Board. The statement is signed by the Chairman and Vice-Chairman, who constitute a majority of the Board. The "policy statement", in pertinent part, states that the Board will not accept filings of candidates in 1962 who desire to be elected to either house of the Oklahoma Legislature.

Harry Brown, an announced candidate for the Oklahoma House of Representatives for Oklahoma county, has brought this original action against the State Election Board inviting attention to the "policy statement" and alleging that the Board will not accept any filing for State Representatives in Oklahoma during the year 1962 unless they be compelled to do so. He prays for a writ of mandamus against the defendants, and each of them, to prevent interference with the election processes of the State of Oklahoma in respect to the filing of potential legislative candidates for the year 1962.

This petition presents two propositions that must be considered and disposed of by this court: First, will State Representatives be elected in 1962; and second, if so, what apportionment law will be followed in the election of State Representatives. We are not here concerned with the apportionment of the State Senate.

As to the first proposition, as to whether State Representatives will be elected in 1962, Art. 5, Sec. 10, Okla.Const., provides that members of the House of Representatives shall hold office for two years. 26 O.S.1951 Sec. 113, as amended (26 O.S.1961 Sec. 113) provides that the first Tuesday in the month of May of each even numbered year shall be biennial regular primary election day. In 26 O.S.1951 Sec. 162, it is provided that any qualified elector who is a member of a political party and properly affiliated with such party, shall have his name printed on the official ballot of his party for an office to which he is eligible in any primary election, upon filing with the proper officer, within the time provided by law, a Notification and Declaration of his candidacy. This section further provides that notifications and declarations of candidacy for members of the Senate and House of Representatives shall be filed with the Secretary of the State Election Board. 26 O.S.1951 Sec. 163, as amended (26 O.S.1961 Sec. 163), provides that Notifications and Declarations required to be filed with the Secretary of the Election Board shall be filed within a period of five days beginning on the fourth Monday in February.

26 O.S.1951 Sec. 168.1, provides that within thirty days after the close of the filing period for state offices, it shall be the duty of the Secretary of the State Election Board to certify to the secretaries of the several county election boards a list of candidates for the State Senate and House

of Representatives for the various counties, and that the county election boards shall cause the names of such candidates to be placed on the county ballot.

Other provisions of the election laws provide penalties for the failure of any official to perform the duties enjoined upon him by the election laws.

■ In the first paragraph of the syllabus in Lowry et al. v. Town of Meeker et al., 151 Okl. 264, 1 P.2d 378, it is held:

"A court of equity has no jurisdiction to restrain the holding of an election authorized by law to be held, since the right involved is a political one."

See also Daly et al. v. Madison County et al., 378 Ill. 357, 38 N.E.2d 160, to the same effect.

■ Public officers have only such authority as is conferred upon them by law, and such authority must be exercised in the manner prescribed by law. Shaw v. Grumbine, 137 Okl. 95, 278 p. 311.

■ From the foregoing constitutional and statutory provisions, and case law, it follows that the Secretary of the State Election Board must accept filings by candidates for legislative positions to be filled in 1962, and that all members of the State Election Board whether operating individually or as a Board must comply with the election laws of this state. This means that the Secretary must accept the filings and discharge the other duties enjoined upon him by law, and that the Board, and its individual members, must discharge the duties enjoined upon them by law.

The second question for our determination is what apportionment law will be followed. This question has been considered in Jones v. Freeman (1943), 193 Okl. 554, 146 P.2d 564; Romang v. Cordell (1952), 206 Okl. 369, 243 P.2d 677; and Jones v. Winters (1961), decided Dec. 1961, No. 39,857, 369 P.2d 135. However, from our further study of these cases, constitutional and statutory provisions, as well as cases from other jurisdictions, we have determined that further consideration must be given to the problem.

In Jones v. Freeman, supra, it was said:

"By art[icle] V, secs. 12–16 of the Constitution, 109 representatives were apportioned among the 75 counties created by the Constitution, each county being given at least one representative. (Two counties, Harmon and Cotton, have been created since the Constitution was adopted). However, the framers of the Constitution intended that the legislative apportionment contained therein should serve only until 1911. They made it the duty of the Legislature at that time to enact a new apportionment law, based upon the population as ascertained by the Federal census of 1910, or in such other manner as the Legislature might direct * * *."

■ In Jones v. Freeman, Romang v. Cordell, and Jones v. Winters, supra, it was *assumed* that we could, by choice, discard all legislature-made apportionments of the House of Representatives and direct that elections be held under Secs. 12–16 of Art. 5, Okla.Const. The question of whether we could, or may, utilize Secs. 12–16, Art. 5, as a matter of law, in the apportionment of the House has never been specifically considered by this court.

From Art. 5, § 10, Okla.Const. it is clear that the framers of our constitution intended that the Legislature would reapportion the House of Representatives in 1911.

It is equally clear when Art. 5, Secs. 12–16, Const., are examined in connection with Art. 5, Sec. 10, Const., the framers of the Constitution intended that Secs. 12–16 be utilized as temporary expedients. Secs. 12–16 being temporary in nature, are statutory in nature. 11 Am.Jur., Constitutional Law, §§ 3 and 4, p. 603, et seq.; State ex rel. Halliburton v. Roach, 230 Mo. 409, 130 S.W. 689, discussed in In re Initiative Petition Number 259, State Question No. 376, Okl., 316 P.2d 139.

As contemplated by the framers of our Constitution our Legislature did in 1911 en-

act Senate Bill No. 243, Laws 1911, p. 266 being "AN ACT providing for the reapportionment of the state of Oklahoma into representative districts and for other purposes."

Again in 1921, as contemplated by Sec. 10, Art. 5, Const., Senate Bill No. 339 was enacted, Laws 1921 p. 69. This was "AN ACT vitalizing Sec[tion] 10, of Article 5, of the Constitution of Oklahoma, relating to the apportionment of representatives during the decennial period * * * and fixing the representatives' districts."

In 1931 (House Bill No. 269), 14 Okl.St. Ann. § 81 et seq., the Legislature again vitalized Sec. 10, Art. 5, Const., and divided the State into representative districts.

It must be remembered that the apportionment laws enacted in 1911, 1921, and 1931, were enacted at a time when many of the framers of our Constitution, and those who voted for it, were still alive. They accepted these new apportionment laws in lieu of the temporary apportionment provided by Secs. 12–16, Art. 5, Const. No attack was made upon these legislature-made apportionment laws until 1943 in Jones v. Freeman, supra.

In a similar, if not identical case, the Supreme Court of Wyoming (State v. Schnitger, 16 Wyo. 479, 95 P. 698) in considering whether a temporary apportionment provided for in their constitution could be utilized after later apportionment acts had been adopted by the legislature, said:

"The apportionment found in the Constitution was based upon the number of votes cast at the election preceding the framing of that instrument. It was intended by the convention to apply only to the first state election. It was so stated in the debates and proceedings of the convention, and it was further expected that the first state Legislature would pass an apportionment act based on the provisions and requirements of the Constitution. It was intended to be temporary in its application, and was applicable to the conditions existing at that time. It does not partake of that fixed and enduring character of other constitutional provisions which never yield to legislative enactment; nor can it at any time be applied so as to disturb conditions which are the legitimate outgrowth of such other provisions, and which are permanent in their nature. Such inapplicability does not arise from the infirmity of the apportionment acts complained of, but from fixed conditions with reference to legislative representation which exists at the present time, and which are the outgrowth, of other constitutional provisions. It does not follow that a valid legislative enactment is necessary to render this apportionment inapplicable. It may be so rendered by the operation of other constitutional provisions under which the legislative department of the government has been organized and established, and out of which conditions have arisen which render it inapplicable, without violating the spirit and express provisions of the constitution. * * *"

■ There is another principle of law that seems applicable to the question presented here, and that is, that any law-making body which has the authority to determine when a law will become effective also has the authority to determine when its effectiveness will cease. It may provide a specific date, event, or circumstance for its termination. In Cunningham v. Smith, 143 Kan. 267, 53 P.2d 870, it is said:

"The time a statute is in force may be limited at the time it is enacted by fixing a date, event, or circumstance for its termination (26 A. & E. Ency. of Law, p. 534), and, when the time so limited expires, it ceases to operate (Id. p. 715). See, also, Lewis' Sutherland Statutory Construction (2d Ed.) § 244; 25 R.C.L. 765. When an act expires by its own limitations, the effect is the same as though it had been repealed at that time. 25 R.C.L. 932."

We hold that Sections 12, 13, 14, 15, and 16, Art. 5, Okla.Const., are not now ap-

plicable, and may not be resorted to for the apportionment of the House of Representatives in 1962.

█ The reapportionment laws of 1941 (House Bill No. 192) 14 Okl.St.Ann. § 45.1 et seq.; of 1951 (House Bill No. 348), Laws 1951, p. 28; and of 1961 (House Bill No. 1033) 14 Okl.St.Ann. §§ 97–101 specifically repeal all laws or parts of laws in conflict therewith.

Since Sections 12, 13, 14, 15, and 16, of Art. 5, Okla.Const., have become inoperative by virtue of later apportionments and other considerations heretofore noted, and all apportionments by the Legislature between 1911 and 1951, both inclusive, have been repealed, it follows that if we should hold the 1961 apportionment law unconstitutional, it being the only apportionment law available, then we have disrupted state government in Oklahoma. Confronted with an identical situation in an apportionment case in 1896, the Supreme Court of Indiana in Fesler v. Brayton, 145 Ind. 71, 44 N.E. 37, 32 L.R.A. 578, said:

"* * * Can the appellee have any right to invoke the power of this court to dissolve the state government? Can any citizen of this state have the right to invoke the power of the judiciary by injunction to put an end to the government that protects his life, his liberty, and his property? The proposition the appellee presents, stripped of all subterfuges, is that, unless the governor shall convene the legislature in extra session, there shall be no more elections of legislatures in this state, under our constitution. But suppose we respond to the demand of the appellee, and, having entered the field of investigation, find the act of 1885 defective, and strike it down, and start the people of this state on a voyage that may lead them into the troubled sea of anarchy; * * *. A careful study of the whole subject convinces us that it was the intention of the framers of the supreme law to impress on its every feature the principle of perpetuity in the government.

If the scheme of the appellee may be effectuated, that noble aspiration of the founders of our state government may be defeated at the suit of a single individual, by the invocation of the power they vested in the judiciary. * * * The case before us, though undoubtedly not so intended, is, in reality, an attack upon the integrity of the state government. This court * * * can never be authorized so to act as to put an end to its own existence, or the existence of any co-ordinate branch of the state government. Any law, however defective, must stand so long as such law is necessary for the continued movement of the political organization formed by the people. * * *

* * * * * *

"* * * While the framers of that sacred instrument, and the voters who adopted it, were all still living, they construed it to mean that the existing apportionment law, whether good or bad, in or out of date, must continue in force until a new one is enacted to take its place, and that the government shall not be brought to an untimely end because of the failure of the legislature to perform the duty enjoined upon it by the constitution. * * *"

The State of Tennessee has been troubled by an identical legal question. There the Legislature has not reapportioned itself since 1901. In Kidd v. McCanless (1956), 200 Tenn. 273, 292 S.W.2d 40, it is said:

"It seems obvious and we therefore hold that if the Act of 1901 is to be declared unconstitutional, then the *de facto* doctrine cannot be applied to maintain the present members of the General Assembly in office. If the Chancellor is correct in holding that this statute has expired by the passage of the decade following its enactment then for the same reason all prior apportionment acts have expired by a lapse of time and are non-existent. Therefore we would not only not have any existing members of the General

Assembly but we would have no apportionment act whatever under which a new election could be held for the election of members to the General Assembly.

\* \* \* \* \* \*

"Under the allegations of the bill this Act was invalid at the time it was enacted, but the bill fails to allege the existence of a prior valid apportionment act to fall back upon. In that situation the authorities are practically unanimous in holding that a court will not declare such a statute invalid. In Fesler v. Brayton, 145 Ind. 71, 44 N.E. 37, 32 L.R.A. 578, the Court said that the effect of striking down an apportionment statute under those circumstances would be to destroy the State Government. See also State ex rel. Winnie v. Stoddard, 25 Nev. 452, 62 P. 237, 51 L.R.A. 229. In State ex rel. Sullivan v. Schnitger, 16 Wyo. 479, 95 P. 698, at page 708, a number of cases are cited for the proposition that the court will not declare an apportionment act invalid unless there is a prior valid act on which they may fall back."

In State ex rel. Tayrien v. Doggett (1956), Okl.Cr., 296 P.2d 185, it was contended that a criminal statute adopted by the Oklahoma Legislature in 1955 was unconstitutional in that the statute was not passed by a legislature that was a constitutionally composed assembly under the reapportionment provisions of the Constitution. Therein it was said:

"To sustain the contention of the petitioner would result in creating a state of chaos and confusion. Probably 95 percent of the prisoners now confined in penal institutions of the state have been committed for violating some statute enacted subsequent to what the petitioner claims was the last valid apportionment act of the Legislature and they would be entitled to their discharge. \* \* \* The appropriations under which every department of state government now operates would be

illegal and the very foundations of government would cease. These and many more illustrations could be used to show the utter folly of the issuance of an order such as that sought by the petitioner. On the grounds of public policy and due regard for the administration of justice and an orderly system of laws and government, the writ of prohibition should be denied. It is so ordered."

For the reasons set forth in the foregoing cases we can not destroy the apportionment law of 1961 since we have concluded there is no earlier apportionment of the House that may be followed.

■ In the brief of the State Election Board, filed on rehearing, it is said that this court has held in Jones v. Freeman, 193 Okl. 554, 146 P.2d 564; Romang v. Cordell, 206 Okl. 369, 243 P.2d 677; and in Jones v. Winters, No. 39857, Okl., 369 P.2d 135, that all apportionment laws enacted by the Legislature of Oklahoma are unconstitutional. It is true that there is language in these cases to the effect that the apportionment laws do not comply with provisions of Art. 5, Sec. 10, Okla.Const. in all particulars, but the court did not *hold* that these laws were unconstitutional; for if it had, it would have followed through and granted injunctive relief in those cases to prevent the election of an unconstitutional legislative body. An unconstitutional legislative body can not enact legal legislation. Kidd v. McCanless, supra.

■ In an amicus curiae brief filed by the Governor, in the instant case, it is suggested that under the constitutional apportionment formula, Art. 5, Sec. 10, Okla. Const., apportionment is more mathematical and ministerial in nature than legislative. He admits that where it becomes necessary to join counties together in forming legislative districts this would involve legislative discretion in determining "which adjoining counties" should be combined to form a legislative district. Even if the problem can be said to be that simple the court would still be exercising a function (reapportionment)

which has not been conferred upon this court. The Constitution in delegating that duty to the Legislature impliedly deprived the court of that power. See Jones v. Freeman and Jones v. Winters, supra. We have found no case from any court, with constitutional provisions similar to ours, where the court has made the apportionment.

■ Our attention is invited to cases from other jurisdictions where the courts have been persuaded to retain jurisdiction during a legislative period for the purpose of coercing the Legislature to enact apportionment laws consistent with constitutional formulas. In the instant case the Governor states that he will call the Legislature into special session if this court will first tell the Legislature that it will reapportion the Legislature if the Legislature will not. To follow this suggestion would be an attempt to exercise "judicial coercion" against the Legislature which is wholly beyond the authority of this court. An individual legislator may be willing to vote himself out of an office, but it would be difficult to find one who is willing to vote his constituents out of a legislator, contrary to their wishes.

The Governor suggests that this court could direct the State Election Board to submit a proposed apportionment of the House of Representatives for the approval of the court, and then order elections in compliance with the approved apportionment. No law is cited in support of this procedure. In any event this court would be doing indirectly what it may not do directly, and that is, make the apportionment.

■ The Governor suggests that members of the House might be elected on "an at-large basis." If we correctly understand this proposition one hundred and twenty representatives would be nominated and elected by the people of the whole state without reference to any counties. Cases are cited wherein Congressional Delegations were elected on an at-large basis. This procedure cannot be utilized in Oklahoma in the Election of State representatives. Art. 5, Sec. 10, provides that the State shall be apportioned into "representative" districts, and subsection 10(d) provides that "no county shall ever take part in the election of more than seven representatives.

All of the foregoing suggestions were submitted to a three-judge Federal Court in the State of Tennessee in Baker v. Carr (D.C.1960), 179 F.Supp. 824. In that case the court said:

"* * * In view of this decision, (referring to the decision in Kidd v. McCanless, 200 Tenn. 273, 292 S.W.2d 40, supra) the plaintiffs recognize that the Court, if it declared the existing apportionment statute unconstitutional, would be required to go further and devise an appropriate remedy so as to avoid a disruption of state government. However, *the remedies suggested by the plaintiffs are neither feasible nor legally possible.*" (emphasis supplied)

In that case the court reviewed an "array of decisions" by the Supreme Court of the United States, the case of Radford v. Raymond Gary, Governor, promulgated in 1956 by a three-judge Federal Court in Oklahoma (reported in 145 F.Supp. 541), and concluded as follows:

"The question of the distribution of political strength for legislative purposes has been before the Supreme Court of the United States on numerous occasions. From a review of these decisions there can be no doubt that the federal rule, as enunciated and applied by the Supreme Court, is that the federal courts, whether from a lack of jurisdiction or from the inappropriateness of the subject matter for judicial consideration, will not intervene in cases of this type to compel legislative reapportionment. * * *"

■ The Governor also suggests that this court could direct that votes of legislators in the legislative assembly be given fractional values. That is, increase or diminish the value of the vote of a legislator to correspond with the result which would have followed if the Legislature had been

apportioned according to the constitutional formula. This suggestion was considered by the court in Asbury Park Press, Inc. v. Wooley, 33 N.J. 1, 161 A.2d 705. That court suggested that the litigants file briefs on that proposition for the consideration of the court. Briefs were filed in 1960, and at our request that court has made copies available for our use. In their briefs on that proposition the attorneys, on all sides of the controversy, were in agreement that "fractional vote values" were incompatible with the provisions of their Constitution. We find such a procedure would be incompatible with provisions of our Constitution, Art. 5, Secs. 31, 34, and 58. The New Jersey Court did not promulgate an opinion on that proposition, or any other proposition, for the reason that the Legislature adopted an appropriate apportionment act while the case was pending.

■ It is said in briefs that under the provisions of Art. 5, Sec. 10(j), Okla.Const., we have been given jurisdiction to review legislative apportionments. It is also said that the grant of jurisdiction to review is a grant of jurisdiction to "revise". We held otherwise in Jones v. Freeman, supra. But assuming we have jurisdiction to "revise" it does not follow that we have jurisdiction to "revise" approximately two-thirds of House Bill No. 1033. This would constitute a court-made apportionment which all courts, with constitutional provisions similar to ours, have held they may not do. In Colgrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, it was said:

"It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law."

See other examples of constitutional commands held to be non-justiciable or unenforceable by courts "because they * * * fall outside the conditions and purposes that circumscribe judicial action" and are essentially of a "political nature". Kidd v.

McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L. Ed.2d 157; Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328; Cook v. Fortson, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596; Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385, 122 A.L.R. 695; Pacific States Telephone and Telegraph Company v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377; Luther v. Borden, 7 How. 1, 12 L.Ed. 581. Our decision in this case, however, is based solely on our construction of our State Constitution and statutes.

In a supplemental brief filed by the Election Board it is asserted that "authority exists for apportionment by the Court or at the order of the Court," citing the late cases of In re Review of Chapter 482, Oregon Laws 1961, Or., 364 P.2d 1004, and In re Apportionment of Senators and Representatives Under Article IV, § 6, Oregon Constitution, Or., 365 P.2d 1042. Obviously the Election Board, in citing these cases, is not familiar with the Oregon Constitution as amended in 1952. The Oregon Constitution provides an apportionment formula in Sec. 6(1) of Article IV, and directs their Legislature to reapportion itself after each Federal decennial census under that formula. It gives original jurisdiction to their Supreme Court to review the legislative apportionment in an action timely brought by a qualified elector. In Sec. 6(2) (c), of Art. IV, of their Constitution, it is provided:

"If the Supreme Court determines that the measure does not comply with subsection (1) of this section, said measure shall be null and void, and the Supreme Court shall direct the Secretary of State to draft a reapportionment of the senators and representatives in compliance with subsection (1), and return the draft to the Supreme Court * * *. The Supreme Court shall review the draft thus returned to it and if it be in compliance with subsection (1), shall file it with the Governor * * * and it shall become law upon the date of filing."

Section 6(2) (d) of Art. IV, directs the Court to return the draft to the Secretary of State, if the draft does not comply with the formula, with instructions as to how the draft must be amended so as to comply with the formula.

Section 6(3) (a), of Art. IV, of their Constitution, provides that if the Oregon Legislature fails to enact any reapportionment measure by July 1, of the year of the session following a Federal decennial census, then the Secretary of State shall make a reapportionment of the senators and representatives in accordance with the formula. It further provides that the Secretary's reapportionment shall be filed with the Governor, and shall become the law upon the date of filing.

Legislative apportionments in Oklahoma are subject to review by this court, "under such rules and regulations as the Legislature may prescribe." Art. 5, Sec. 10(j) Okla. Const. The Legislature has prescribed no rules and regulations to implement our jurisdiction to review. The Oregon cases are not in point.

We have held numerous times and as early as 1943 (Jones v. Freeman, supra) that if the Legislature is unable to reapportion itself the people have reserved that power unto themselves either by a constitutional amendment, or by an initiated statutory enactment.

Defendants, Clee Fitzgerald and Herbert F. Hewett, of the State Election Board have posed two questions, as follows:

1. "Since the apportionment act (H. B. 1033 of the Twenty-Eighth Legislature) does not comply with the requirements of Article 5, Section 10, Okla.Const., is not unconstitutional?"

2. "If the act in question is in violation of the Constitution, and thus unconstitutional, can this Court require respondents, who have taken oaths to support, obey and defend the Constitution of Oklahoma, to administer and enforce said unconstitutional acts?"

Before answering these questions we remind the defendants, Fitzgerald and Hewett, that public officials are nominated by a mandatory primary system in Oklahoma. In Art. 3, Sec. 5, Okla.Const., it is provided, in part:

"The Legislature shall enact laws providing for a *mandatory* primary system, which shall provide for the nomination of candidates in all elections for State, District, County, and municipal officers, for all political parties * * *." (emphasis supplied)

The Legislature has, pursuant to the command of Art. 3, Sec. 5, enacted laws providing for a "mandatory primary system," the general provisions of which are found in 26 O.S.1951, § 111 et seq. as amended (26 O.S.1961 § 111 et seq.). How the defendants may fail to hold an election for State Representatives (which is mandatory) without violating Art. 3, Sec. 5, and all of our election laws has not been explained.

The dilemma in which we and the Election Board find ourselves was neither created by the Election Board nor this Court. An election must be held for State Representatives under an apportionment. The only apportionment law in existence is found in H.B. 1033, supra, which defendants allege is unconstitutional. Will that apportionment be followed, or will we refuse to hold an election and violate the mandatory primary election laws and Art. 3, Sec. 5, Okla.Const.? If no election is held those Representatives now serving "shall continue to perform the duties of their offices until their successors shall be * * * qualified." Art. 23, Sec. 10, Okla. Const. The Representatives now serving were elected from legislative districts created by the apportionment law of 1951. If the 1961 apportionment law is unconstitutional then it would seem that we should for the same reasons now hold the 1951 apportionment is also unconstitutional. See Romang v. Cordell, supra. The 1951 apportionment was based upon the Federal decennial census of 1950, while the 1961

apportionment was based upon the Federal decennial census of 1960. Greater inequality of representation will result if we retain those Representatives in office who were elected under the 1951 apportionment.

██ Courts have a right to exercise a *legal* discretion. In the second paragraph of the syllabus in Ratzlaff v. State, 102 Okl. 263, 229 P. 278, it is held:

"We approve the rules announced by Chief Justice Marshall where he said: 'Courts are mere instruments of the law and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.' Osborn v. U. S. Bank, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204."

We think the constitutional command to hold a primary election, based upon the considerations heretofore noted, is paramount and must be followed. Based upon considerations heretofore noted we are not at liberty to hold H.B. 1033 unconstitutional unless and until a "legal apportionment" can be created or enacted. To do so would be destructive of our State government.

While it seems doubtful that defendants have a right to question the constitutionality of H.B. 1033, supra, until they are about to be denied some right or privilege to which they are entitled, Shinn v. Oklahoma City, 184 Okl. 236, 87 P.2d 136, it is clear that this Court is given jurisdiction to make the final determination of this question. In Dancy v. Owens, 126 Okl. 37, 258 P. 879, it is held in the fifth paragraph of the syllabus:

"Neither the Constitution nor statutes of the state undertake to give any

state court the power or jurisdiction to review, modify, override, or vacate the final judgment of the Supreme Court, under the guise of any writ or process, and the attempt of such court to do so is without authority of law, and its orders which, if effective, would so override, annul, and vacate the final order and judgment of this court, are void, and must be so adjudged and decreed by this court, when brought to it for review."

██ For the reasons noted throughout this opinion and those which naturally follow constitutional, statutory, and case law herein referred to, we have concluded that the 1961 apportionment law must be utilized in the 1962 election whether it does, or does not, wholly follow the constitutional formula. This court having made such final determination it follows that the members of the State Election Board will not violate their oaths of office in administering and utilizing the 1961 apportionment law in the election of 1962.

██ In an application for permission to file a second petition for rehearing in this case it is asserted that:

"The apportionment acts under which legislative elections will be held * * * are clearly violative of the 14th amendment to the Constitution of the United States of America in that they deny to the citizen-electors of Oklahoma the equal protection of the laws and deprive them of their liberty and property without due process of law."

This is the first time this issue has been injected into this case, and there is no brief filed in support thereof. The rule established by this court is that non-jurisdictional questions, raised for the first time by a petition for rehearing, will not ordinarily be considered. Hope v. Peck, 38 Okl. 531, 134 P. 33. Contentions requiring research, which are neither supported by authorities nor argument, will not be decided. Fields v. Moran, 179 Okl. 485, 66 P.2d 502. There

is not now sufficient time to go into the matter since the statute, 26 O.S.1951 § 163, as amended (26 O.S.1961 § 163), requires notifications and declarations for legislative positions to be filed with the Secretary of the Election Board during a five day period beginning on the fourth Monday in February, 1962. We do believe, however, that this proposition has been presented to the United States Supreme Court in Jones v. Freeman, 322 U.S. 717, 64 S.Ct. 1288, 88 L.Ed. 1558; in Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157; and in Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540, but we have found no case where this proposition has been adjudicated by that Court. We do not feel that we should forecast or anticipate the decision that may ultimately be rendered by the United States Supreme Court on an essentially federal question.

The writ of mandamus is granted and the Secretary of the State Election Board, and his successors in office, if any, are specifically directed to receive filings for the offices of State Representatives pursuant to the election laws of this State, under and pursuant to H.B. 1033 of the Twenty-Eighth Legislature (14 O.S.1961, § 97 et seq.), and to proceed to comply with any ministerial and other functions required by the election laws of this State, and it is so ordered.

The other defendants herein, Clee Fitzgerald and Herbert F. Hewett, and their successors, if any, and each of them, are directed to utilize the apportionment act of 1961, House Bill No. 1033, of the Twenty-Eighth Legislature (14 O.S.1961, § 97 et seq.), in performing their duties, and to otherwise comply with their legal duties under the election laws of this State, and it is so ordered.

In the event this opinion is deemed uncertain or not sufficiently clear as to the specific duties enjoined by law on any of the defendants, and their successors, if any, and on account thereof there is any doubt as to which acts these defendants, or either of them, should perform, or be required to perform, and if the time comes when this opinion should be clarified as to the detail of any such act or function of the defendants, or either of them, in respect to the 1962 elections, or preliminaries to such elections, then in either such event any interested person may request permission to file in this action an application to the court to make such matters clear and to issue proper order, or orders, in reference thereto, and any such application filed will be considered with appropriate dispatch.

BLACKBIRD, V. C. J., and WELCH, DAVISON, JOHNSON and IRWIN, JJ., concur.

WILLIAMS, C. J., concurs in part and dissents in part.

HALLEY and BERRY, JJ., dissent.

HALLEY, Justice (dissenting).

Because of the fact that I still think that fifty-one counties of the State have representatives provided for under House Bill 1033 of the 1961 Legislature and that they are provided for in a constitutional manner, I am of the opinion that the State Election Board should receive filings for such offices. The twenty-six counties that do not qualify under the Constitution of Oklahoma for at least one representative may be attached to adjoining counties that do qualify for the next Legislature. That can be done either by this Court or the State Election Board.

To me this Court has no authority to require the State Election Board to proceed under an Act of the Legislature which it has determined does not fully comply with the Constitution. We should see that the unconstitutional Acts are nullified and constitutional methods adopted.

No one can seriously argue that House Bill 1033 grants equal suffrage and thereby equal representation in the making of the laws of this State. On this point I quote

from Asbury Park Press, Inc. v. Woolley, .33 N.J. 1, 161 A.2d 705, pp. 709–710:

"The legally qualified voters of the several counties are given the right under the Constitution to vote for all officers that are elective by the people. N.J.Const., Art. 2, par. 3. Assemblymen are such officers, and each voter of each county is entitled to cast his ballot for the number of them which the absolute mandate of Article IV, Section III, supra, requires to be allocated to his county. Ours is a representative form of government. It can remain such in the true sense only if the vote of each citizen has equality with that of his neighbor in the other counties of the State, according to the prescription of the organic law. To the extent that his county is given a lesser number of members in the lower House than are its due, his vote diminishes in value, and thus he does not receive the full measure or protection and representation which are of the essence of democracy. No man can boast of a higher privilege than the right granted to the citizens of our State and Nation of equal suffrage and thereby to equal representation in the making of the laws of the land. Under our Constitution that right is absolute. It is one of which he cannot be deprived, either deliberately or by inaction on the part of a Legislature. Inaction which causes an apportionment act to have unequal and arbitrary effects throughout the State is just as much a denial of equality as if a positive statute had been passed to accomplish the result. In our view, deprivation not only offends against the State Constitution but may very well deny equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution. * * *"

If this Court would simply do what I consider its duty in matters of this kind, a solution would be worked out that could not be but an improvement of what we now have.

I dissent.

BERRY, Justice (dissenting).

I disagree with the majority opinion.

Its gist appears to be: Since this Court has never expressly determined and is unwilling to now hold that H.B. 1033 of the 1961 legislative session is unconstitutional, the State Election Board cannot refuse to accept filings by candidates for the House of Representatives without being in violation of certain election statutes; and to directly cope with the unconstitutional features of H.B. 1033 would invite or result in chaos and the end of orderly government.

The State Election Board seeks to justify its policy statement by asserting the invalidity of the 1961 Apportionment Act. The constitutionality of H.B. 1033 has been properly raised and challenged. I, therefore, believe that we must rule upon the constitutionality of H.B. 1033.

As to the constitutionality of H.B. 1033, I refer to my dissenting opinion in Jones v. Winters, Okl., 365 P.2d 357. Neither in Jones v. Freeman, 193 Okl. 554, 146 P.2d 564, nor in Romang v. Cordell, 206 Okl. 369, 243 P.2d 677, did this Court hold that it lacked discretionary powers to grant relief against an unconstitutional reapportionment statute. The Court merely chose not to exercise those powers.

In my opinion, the issues that must first be determined are: (1) Is H.B. 1033 unconstitutional? (2) If it is found unconstitutional, should this Court perpetuate the present state of defiance by the Legislature of the constitutional mandate? (3) Would our refusal to directly or indirectly sanction H.B. 1033 result in chaos and the end of State government? (4) Does H.B. 1033 violate the Fourteenth Amendment to the Federal Constitution? I shall discuss these questions in the sequence in which they stand posed.

(1) Is H.B. 1033 unconstitutional?

In Romang v. Cordell, supra, we stated at p. 679 of 243 P.2d:

"It is not necessary to here discuss, in detail or at length, the constitutionality of the act under consideration. *It violates the provisions of Article V, section 10* of the Oklahoma Constitution in the same particulars and to approximately the same extent as the previous apportionment acts and is, therefore, subject to the same criticisms which were discussed thoroughly in the case of Jones v. Freeman, 193 Okl. 554, 146 P.2d 564, 573. In that opinion, this court pointed out, with particularity, the 'principles, expressed or implied in the Constitution, (which) must be observed' in order for an apportionment act to be constitutional. *None of these were followed in the preparation and passage of the 1951 act.* It would serve no useful purpose to here repeat them or the legal foundation upon which they rest." (emphasis supplied)

In view of the unmistakable language quoted above, it is an exercise of semantics to now announce that this Court has not held the former apportionment acts unconstitutional but merely held them not to comply with the Constitution. To my way of thinking, this is similar to "Tweedledum and Tweedledee". I feel that the constitutionality of H.B. 1033 is now before this Court and *must* be answered in unequivocal terms.

(2) If H.B. 1033 is unconstitutional, should we perpetuate it?

The issues here are not the same as in the Jones and Romang cases. Never before has this Court been called upon to act affirmatively, by the issuance of a writ of mandamus, to compel the State Election Board to follow an apportionment act which the Court has determined to be out of harmony with the mandatory formula of the Constitution. In this respect I consider this case to be vastly different from Jones and Romang. In the cited cases, in which relief was denied, the Court simply desisted from interfering with legislation by inaction. In doing so, it pointed out that although it had the power to review it did not have the authority to reapportion, revise, or compel a legislative revision of the act. In the present case, the Court is called upon, in effect, to approve the legislative malapportionment by a direct and affirmative action in *requiring* the holding of an election thereunder. I know of no decision in which this situation confronted any court in the Nation, and I deem the distinction in this fact significant. While we may have wisely avoided interference with election processes in the past, we should not compel the holding of an election under an invalid act. The opinion of the majority in this case goes beyond mere failure to interfere. It places our power to review at a final resting place.

(3) Would chaos result in State Government?

I cannot conceive that our refusal to uphold H.B. 1033 would result in chaos and destruction of our State government. A similar or identical argument was advanced in Asbury Park Press, Inc. v. Woolley, 33 N.J. 1, 161 A.2d 705, 712, and was answered in this language:

"Some of the defendants suggest that to do so (strike the malapportionment act) would be to create chaos or anarchy, because no matter how long the filing of our mandate was withheld to permit the enactment of a curative law, the state government would be completely disrupted if the Legislature did not act within that time. Although we agree that if the 1941 act has become unconstitutional, resort could not be had to an apportionment act of an earlier vintage because any such measure would also be invalid by the same test, we do not believe that the allegedly feared result would ever come about. *A judiciary, conscious of the sacrosanct quality of its oath of office to uphold the Constitution, cannot accept an in terrorem argument*

*based upon the notion that members of a coequal part of the government will not be just as respectful * * * of the obligations imposed by their similar oath. Any lesser faith on our part would be an unbecoming and unwarranted reflection on the Legislature."* (emphasis supplied)

I share the same confidence in the integrity and bona fides of our Legislature as did the New Jersey Court in the law-making body of that State. In the present cause, many solutions are advanced in the briefs, and in more than one of them I see constitutionally feasible methods and means of preventing chaos, anarchy and disruption of government. The premise of the majority opinion appears to be, that because our Legislature has brought about an impasse, the Constitution can be ignored. If this reasoning is correct, then I submit that we should overrule some of the prior decisions in order to preserve the Constitution.

(4) Does H.B. 1033 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution?

I am firmly of the opinion that H.B. 1033 violates in its effect the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution. This issue may not be timely and properly raised; nor is the argument on rehearing supported by authority. But I disagree with the majority who hold that the question should not receive careful consideration on rehearing. In this important proceeding of general public interest, we should not attempt to hold the parties to the strict rules of practice which govern private litigation.

Neither the Federal Constitution nor the republican form of government guarantees to an individual elector the right to cast his vote on terms of absolute equality with other voters who reside in a different political district or area. The right, if any,

is at best a matter of approximation. In this State we are, on principle, governed by a constitutional formula which is fair, equitable and non-discriminatory on its face. It effects a just, although not completely equal, distribution of representation between rural and urban electors, based upon a population basis. This constitutional formula has been ignored and disregarded by the Legislature for more than a score of years. Instead of following the mandate of the Constitution, the Legislature misapplied the constitutional formula and apportioned the State in a manner which, to my way of thinking, discriminates against a substantial majority of Oklahoma voters who are deprived of that ratio of representation which the law accords.

States are generally free to regulate the right of franchise. The Federal Constitution does not require an equal apportionment of state legislative districts. However, once a state does enact a constitution or a general statute, then its application must be without discrimination or disparities. See Asbury Park Press, Inc. v. Woolley, supra (p. 710 of 161 A.2d); Magraw v. Donovan, 159 F.Supp. 901 (D.C.Minn., 1958); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209. H.B. 1033 is discriminatory both in text and in application.

It is true that in its past decisions, the U. S. Supreme Court has generally regarded questions concerning state election processes as "political" and outside of judicial cognizance. However, I do believe that the precise question here involved has never been decided by that Court, and I feel that we should proceed in this action with the determination of the Federal constitutional question. See Asbury Park Press, Inc., supra.

For the foregoing reasons, I respectfully dissent.