(Slip Opinion)                OCTOBER TERM, 2011                1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ZIVOTOFSKY ET UX. *v.* CLINTON, SECRETARY OF STATE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 10–699.   Argued November 7, 2011—Decided March 26, 2012

Petitioner Menachem Binyamin Zivotofsky was born in Jerusalem.  His mother requested that Zivotofsky's place of birth be listed as "Israel" on a consular report of birth abroad and on his passport, pursuant to §214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003. That provision states: "For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel."  U. S. officials refused the request, citing a State Department policy that prohibits recording "Israel" as the place of birth for those born in Jerusalem.  Zivotofsky's parents filed a suit on his behalf against the Secretary of State.  The District Court dismissed the case, holding that it presented a nonjusticiable political question regarding Jerusalem's political status.  The D. C. Circuit affirmed, reasoning that the Constitution gives the Executive the exclusive power to recognize foreign sovereigns, and that the exercise of that power cannot be reviewed by the courts.

*Held:* The political question doctrine does not bar judicial review of Zivotofsky's claim. Pp. 5−12.

   (a) This Court has said that a controversy "involves a political question . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"  *Nixon* v. *United States*, 506 U. S. 224, 228.  The lower courts ruled that this case presents such a political question because they

misunderstood the issue, assuming resolution of Zivotofsky's claim would require the Judiciary to define U. S. policy regarding the status of Jerusalem. In fact, this case asks the courts to determine only whether Zivotofsky can vindicate his statutory right under §214(d) to choose to have Israel recorded as his place of birth on his passport. Making such determinations is a familiar judicial exercise. Moreover, because the parties do not dispute the interpretation of §214(d), the only real question for the courts is whether the statute is constitutional. There is no "textually demonstrable constitutional commitment" of that question to another branch: At least since *Marbury* v. *Madison*, 1 Cranch 137, this Court has recognized that it is "emphatically the province and duty" of the Judiciary to determine the constitutionality of a statute. Nor is there "a lack of judicially discoverable and manageable standards for resolving" the question: Both parties offer detailed legal arguments concerning whether the textual, structural, and historical evidence supports a determination that §214(d) is constitutional. Pp. 5–12.

(b) Because the lower courts erroneously concluded that the case presents a political question, they did not reach the merits of Zivotofsky's claim. This Court is "a court of final review and not first view," *Adarand Constructors, Inc.* v. *Mineta*, 534 U. S. 103, 110, and ordinarily "do[es] not decide in the first instance issues not decided below," *National Collegiate Athletic Assn.* v. *Smith*, 525 U. S. 459, 470. The merits of this case are therefore left to the lower courts to consider in the first instance. P. 12.

571 F. 3d 1227, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, GINSBURG, and KAGAN, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER, J., joined as to Part I. ALITO, J., filed an opinion concurring in the judgment. BREYER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–699

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS
AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY, PETITIONER *v.* HILLARY
RODHAM CLINTON, SECRETARY
OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 26, 2012]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

Congress enacted a statute providing that Americans
born in Jerusalem may elect to have "Israel" listed as the
place of birth on their passports. The State Department
declined to follow that law, citing its longstanding policy of
not taking a position on the political status of Jerusalem.
When sued by an American who invoked the statute, the
Secretary of State argued that the courts lacked authority
to decide the case because it presented a political question.
The Court of Appeals so held.

We disagree. The courts are fully capable of determin-
ing whether this statute may be given effect, or instead
must be struck down in light of authority conferred on the
Executive by the Constitution.

I
A

In 2002, Congress enacted the Foreign Relations Au-

thorization Act, Fiscal Year 2003, 116 Stat. 1350. Section 214 of the Act is entitled "United States Policy with Respect to Jerusalem as the Capital of Israel." *Id.,* at 1365. The first two subsections express Congress's "commitment" to relocating the United States Embassy in Israel to Jerusalem. *Id.,* at 1365–1366. The third bars funding for the publication of official Government documents that do not list Jerusalem as the capital of Israel. *Id.,* at 1366. The fourth and final provision, §214(d), is the only one at stake in this case. Entitled "Record of Place of Birth as Israel for Passport Purposes," it provides that "[f]or purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." *Ibid.*

The State Department's Foreign Affairs Manual states that "[w]here the birthplace of the applicant is located in territory disputed by another country, the city or area of birth may be written in the passport." 7 Foreign Affairs Manual §1383.5–2, App. 108. The manual specifically directs that passport officials should enter "JERUSALEM" and should "not write Israel or Jordan" when recording the birthplace of a person born in Jerusalem on a passport. *Id.*, §1383, Exh. 1383.1, App. 127; see also *id.,* §§1383.1, 1383.5–4, .5–5, .5–6, App. 106, 108–110.

Section 214(d) sought to override this instruction by allowing citizens born in Jerusalem to have "Israel" recorded on their passports if they wish. In signing the Foreign Relations Authorization Act into law, President George W. Bush stated his belief that §214 "impermissibly interferes with the President's constitutional authority to conduct the Nation's foreign affairs and to supervise the unitary executive branch." Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003, Public Papers of the Presidents, George W. Bush, Vol. 2,

Sept. 30, 2002, p. 1698 (2005). He added that if the section is "construed as mandatory," then it would "interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states." *Ibid.* He concluded by emphasizing that "U. S. policy regarding Jerusalem has not changed." *Ibid.* The President made no specific reference to the passport mandate in §214(d).

### B

Petitioner Menachem Binyamin Zivotofsky was born in Jerusalem on October 17, 2002, shortly after §214(d) was enacted. Zivotofsky's parents were American citizens and he accordingly was as well, by virtue of congressional enactment. 8 U. S. C. §1401(c); see *Rogers* v. *Bellei*, 401 U. S. 815, 835 (1971) (foreign-born children of American citizens acquire citizenship at birth through "congressional generosity"). Zivotofsky's mother filed an application for a consular report of birth abroad and a United States passport. She requested that his place of birth be listed as "Jerusalem, Israel" on both documents. U. S. officials informed Zivotofsky's mother that State Department policy prohibits recording "Israel" as Zivotofsky's place of birth. Pursuant to that policy, Zivotofsky was issued a passport and consular report of birth abroad listing only "Jerusalem." App. 19–20.

Zivotofsky's parents filed a complaint on his behalf against the Secretary of State. Zivotofsky sought a declaratory judgment and a permanent injunction ordering the Secretary to identify his place of birth as "Jerusalem, Israel" in the official documents. *Id.,* at 17–18. The District Court granted the Secretary's motion to dismiss the complaint on the grounds that Zivotofsky lacked standing and that his complaint presented a nonjusticiable political question.

The Court of Appeals for the D. C. Circuit reversed, concluding that Zivotofsky did have standing. It then observed that while Zivotofsky had originally asked that "Jerusalem, Israel" be recorded on his passport, "[b]oth sides agree that the question now is whether §214(d) entitles [him] to have just 'Israel' listed as his place of birth." 444 F. 3d 614, 619 (2006). The D. C. Circuit determined that additional factual development might be helpful in deciding whether this question was justiciable, as the parties disagreed about the foreign policy implications of listing "Israel" alone as a birthplace on the passport. *Id.,* at 619–620. It therefore remanded the case to the District Court.

The District Court again found that the case was not justiciable. It explained that "[r]esolving [Zivotofsky's] claim on the merits would necessarily require the Court to decide the political status of Jerusalem." 511 F. Supp. 2d 97, 103 (2007). Concluding that the claim therefore presented a political question, the District Court dismissed the case for lack of subject matter jurisdiction.

The D. C. Circuit affirmed. It reasoned that the Constitution gives the Executive the exclusive power to recognize foreign sovereigns, and that the exercise of this power cannot be reviewed by the courts. Therefore, "deciding whether the Secretary of State must mark a passport . . . as Zivotofsky requests would necessarily draw [the court] into an area of decisionmaking the Constitution leaves to the Executive alone." 571 F. 3d 1227, 1232–1233 (2009). The D. C. Circuit held that the political question doctrine prohibits such an intrusion by the courts, and rejected any suggestion that Congress's decision to take "a position on the status of Jerusalem" could change the analysis. *Id.*, at 1233.

Judge Edwards concurred in the judgment, but wrote separately to express his view that the political question doctrine has no application to this case. He explained that

the issue before the court was whether §214(d) "impermissibly intrude[s] on the President's exclusive power to recognize foreign sovereigns." *Id.,* at 1234. That question, he observed, involves "commonplace issues of statutory and constitutional interpretation" plainly within the constitutional authority of the Judiciary to decide. *Id.,* at 1235. Reaching the merits, Judge Edwards determined that designating Israel as a place of birth on a passport is a policy "in furtherance of the recognition power." *Id.,* at 1243. Because in his view the Constitution gives that power exclusively to the President, Judge Edwards found §214(d) unconstitutional. For this reason, he concluded that Zivotofsky had no viable cause of action, and concurred in affirming the dismissal of the complaint.

Zivotofsky petitioned for certiorari, and we granted review. 563 U. S. ___ (2011).

## II

The lower courts concluded that Zivotofsky's claim presents a political question and therefore cannot be adjudicated. We disagree.

In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821). Our precedents have identified a narrow exception to that rule, known as the "political question" doctrine. See, *e.g., Japan Whaling Assn.* v. *American Cetacean Soc.*, 478 U. S. 221, 230 (1986). We have explained that a controversy "involves a political question . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon* v. *United States*, 506 U. S. 224, 228 (1993) (quoting *Baker* v. *Carr*, 369 U. S. 186, 217 (1962)). In such a case, we have held that a court lacks the authority to decide the dispute before it.

The lower courts ruled that this case involves a political question because deciding Zivotofsky's claim would force the Judicial Branch to interfere with the President's exercise of constitutional power committed to him alone. The District Court understood Zivotofsky to ask the courts to "decide the political status of Jerusalem." 511 F. Supp. 2d, at 103. This misunderstands the issue presented. Zivotofsky does not ask the courts to determine whether Jerusalem is the capital of Israel. He instead seeks to determine whether he may vindicate his statutory right, under §214(d), to choose to have Israel recorded on his passport as his place of birth.

For its part, the D. C. Circuit treated the two questions as one and the same. That court concluded that "[o]nly the Executive—not Congress and not the courts—has the power to define U. S. policy regarding Israel's sovereignty over Jerusalem," and also to "decide how best to implement that policy." 571 F. 3d, at 1232. Because the Department's passport rule was adopted to implement the President's "exclusive and unreviewable constitutional power to keep the United States out of the debate over the status of Jerusalem," the validity of that rule was itself a "nonjusticiable political question" that "the Constitution leaves to the Executive alone." *Id.,* at 1231–1233. Indeed, the D. C. Circuit's opinion does not even mention §214(d) until the fifth of its six paragraphs of analysis, and then only to dismiss it as irrelevant: "That Congress took a position on the status of Jerusalem and gave Zivotofsky a statutory cause of action . . . is of no moment to whether the judiciary has [the] authority to resolve this dispute . . . ." *Id.*, at 1233.

The existence of a statutory right, however, is certainly relevant to the Judiciary's power to decide Zivotofsky's claim. The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United

States policy toward Jerusalem should be. Instead, Zivo-
tofsky requests that the courts enforce a specific statutory
right. To resolve his claim, the Judiciary must decide if
Zivotofsky's interpretation of the statute is correct, and
whether the statute is constitutional. This is a familiar
judicial exercise.

Moreover, because the parties do not dispute the inter-
pretation of §214(d), the only real question for the courts is
whether the statute is constitutional. At least since *Mar-
bury* v. *Madison*, 1 Cranch 137 (1803), we have recognized
that when an Act of Congress is alleged to conflict with the
Constitution, "[i]t is emphatically the province and duty of
the judicial department to say what the law is." *Id.,* at
177. That duty will sometimes involve the "[r]esolution of
litigation challenging the constitutional authority of one of
the three branches," but courts cannot avoid their respon-
sibility merely "because the issues have political implica-
tions." *INS* v. *Chadha*, 462 U. S. 919, 943 (1983).

In this case, determining the constitutionality of §214(d)
involves deciding whether the statute impermissibly
intrudes upon Presidential powers under the Constitution.
If so, the law must be invalidated and Zivotofsky's case
should be dismissed for failure to state a claim. If, on the
other hand, the statute does not trench on the President's
powers, then the Secretary must be ordered to issue Zivo-
tofsky a passport that complies with §214(d). Either way,
the political question doctrine is not implicated. "No
policy underlying the political question doctrine suggests
that Congress or the Executive . . . can decide the constitu-
tionality of a statute; that is a decision for the courts." *Id*.,
at 941–942.

The Secretary contends that "there is 'a textually de-
monstrable constitutional commitment'" to the President
of the sole power to recognize foreign sovereigns and, as
a corollary, to determine whether an American born in
Jerusalem may choose to have Israel listed as his place of

birth on his passport. *Nixon*, 506 U. S., at 228 (quoting *Baker*, 369 U. S., at 217); see Brief for Respondent 49–50. Perhaps. But there is, of course, no exclusive commitment to the Executive of the power to determine the constitutionality of a statute. The Judicial Branch appropriately exercises that authority, including in a case such as this, where the question is whether Congress or the Executive is "aggrandizing its power at the expense of another branch." *Freytag* v. *Commissioner*, 501 U. S. 868, 878 (1991); see, *e.g., Myers* v. *United States*, 272 U. S. 52, 176 (1926) (finding a statute unconstitutional because it encroached upon the President's removal power); *Bowsher* v. *Synar*, 478 U. S. 714, 734 (1986) (finding a statute unconstitutional because it "intruded into the executive function"); *Morrison* v. *Olson*, 487 U. S. 654, 685 (1988) (upholding a statute's constitutionality against a charge that it "impermissibly interfere[d] with the President's exercise of his constitutionally appointed functions").

Our precedents have also found the political question doctrine implicated when there is "'a lack of judicially discoverable and manageable standards for resolving'" the question before the court. *Nixon*, *supra*, at 228 (quoting *Baker*, *supra*, at 217). Framing the issue as the lower courts did, in terms of whether the Judiciary may decide the political status of Jerusalem, certainly raises those concerns. They dissipate, however, when the issue is recognized to be the more focused one of the constitutionality of §214(d). Indeed, both sides offer detailed legal arguments regarding whether §214(d) is constitutional in light of powers committed to the Executive, and whether Congress's own powers with respect to passports must be weighed in analyzing this question.

For example, the Secretary reprises on the merits her argument on the political question issue, claiming that the Constitution gives the Executive the exclusive power to formulate recognition policy. She roots her claim in the

Constitution's declaration that the President shall "receive Ambassadors and other public Ministers." U. S. Const., Art. II, §3. According to the Secretary, "[c]enturies-long Executive Branch practice, congressional acquiescence, and decisions by this Court" confirm that the "receive Ambassadors" clause confers upon the Executive the exclusive power of recognition. Brief for Respondent 18.

The Secretary observes that "President Washington and his cabinet unanimously decided that the President could receive the ambassador from the new government of France without first consulting Congress." *Id.,* at 19 (citing Letter from George Washington to the Cabinet (Apr. 18, 1793), reprinted in 25 Papers of Thomas Jefferson 568–569 (J. Catanzariti ed. 1992); Thomas Jefferson, Notes on Washington's Questions on Neutrality and the Alliance with France (May 6, 1793), reprinted in *id.,* at 665–666). She notes, too, that early attempts by the Legislature to affect recognition policy were regularly "rejected in Congress as inappropriate incursions into the Executive Branch's constitutional authority." Brief for Respondent 21. And she cites precedents from this Court stating that "[p]olitical recognition is exclusively a function of the Executive." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 410 (1964); see Brief for Respondent 24–27 (citing, *e.g., United States* v. *Pink*, 315 U. S. 203 (1942)).

The Secretary further contends that §214(d) constitutes an impermissible exercise of the recognition power because "the decision as to how to describe the place of birth . . . operates as an official statement of whether the United States recognizes a state's sovereignty over a territorial area." Brief for Respondent 38. The Secretary will not "list[] as a place of birth a country whose sovereignty over the relevant territory the United States does not recognize." *Id.*, at 39. Therefore, she claims, "listing 'Israel' as the place of birth would constitute an official decision by

the United States to begin to treat Jerusalem as a city located within Israel." *Id.*, at 38–39 (some internal quotation marks omitted).

For his part, Zivotofsky argues that, far from being an exercise of the recognition power, §214(d) is instead a "legitimate and permissible" exercise of Congress's "authority to legislate on the form and content of a passport." Brief for Petitioner 53. He points the Court to Professor Louis Henkin's observation that "'in the competition for power in foreign relations,' Congress has 'an impressive array of powers expressly enumerated in the Constitution.'" *Id.,* at 45 (quoting L. Henkin, Foreign Affairs and the United States Constitution 63 (2d ed. 1996)). Zivotofsky suggests that Congress's authority to enact §214(d) derives specifically from its powers over naturalization, U. S. Const., Art. I, §8, cl. 4, and foreign commerce, *id.,* §8, cl. 3. According to Zivotofsky, Congress has used these powers to pass laws regulating the content and issuance of passports since 1856. See Brief for Petitioner 52 (citing Act of Aug. 18, 1856, §23, 11 Stat. 60).

Zivotofsky contends that §214(d) fits squarely within this tradition. He notes that the State Department's designated representative stated in her deposition for this litigation that the "place of birth" entry is included *only* as "an element of identification." App. 76 (Deposition of Catherine Barry, Deputy Assistant Secretary of State for Overseas Citizens Services); see Brief for Petitioner 10. Moreover, Zivotofsky argues, the "place of birth" entry cannot be taken as a means for recognizing foreign sovereigns, because the State Department authorizes recording unrecognized territories—such as the Gaza Strip and the West Bank—as places of birth. Brief for Petitioner 43 (citing 7 Foreign Affairs Manual §1383.5–5, App. 109–110).

Further, Zivotofsky claims that even if §214(d) does implicate the recognition power, that is not a power the

Constitution commits exclusively to the Executive. Zivotofsky argues that the Secretary is overreading the authority granted to the President in the "receive Ambassadors" clause. He observes that in the Federalist Papers, Alexander Hamilton described the power conferred by this clause as "more a matter of dignity than of authority," and called it "a circumstance, which will be without consequence in the administration of the government." The Federalist No. 69, p. 468 (J. Cooke ed. 1961); see Brief for Petitioner 37. Zivotofsky also points to other clauses in the Constitution, such as Congress's power to declare war, that suggest some congressional role in recognition. Reply Brief for Petitioner 23 (citing U. S. Const., Art. I, §8, cl. 11). He cites, for example, an 1836 message from President Jackson to Congress, acknowledging that it is unclear who holds the authority to recognize because it is a power "no where expressly delegated" in the Constitution, and one that is "necessarily involved in some of the great powers given to Congress." Message from the President of the United States Upon the Subject of the Political, Military, and Civil Condition of Texas, H. R. Doc. No. 35, 24th Cong., 2d Sess., 2; see Reply Brief for Petitioner 11–12.

Zivotofsky argues that language from this Court's precedents suggesting the recognition power belongs exclusively to the President is inapplicable to his claim, because that language appeared in cases where the Court was asked to alter recognition policy developed by the Executive in the absence of congressional opposition. See Brief for Petitioner 44–46; Reply Brief for Petitioner 18–19. Finally, Zivotofsky contends that even if the "receive Ambassadors" clause confers some exclusive recognition power on the President, simply allowing a choice as to the "place of birth" entry on a passport does not significantly intrude on that power.

Recitation of these arguments—which sound in familiar principles of constitutional interpretation—is enough to establish that this case does not "turn on standards that defy

judicial application." *Baker*, 369 U. S., at 211. Resolution of Zivotofksy's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do. The political question doctrine poses no bar to judicial review of this case.

### III

To say that Zivotofsky's claim presents issues the Judiciary is competent to resolve is not to say that reaching a decision in this case is simple. Because the District Court and the D. C. Circuit believed that review was barred by the political question doctrine, we are without the benefit of thorough lower court opinions to guide our analysis of the merits. Ours is "a court of final review and not first view." *Adarand Constructors, Inc.* v. *Mineta*, 534 U. S. 103, 110 (2001) (*per curiam*) (internal quotation marks omitted). Ordinarily, "we do not decide in the first instance issues not decided below." *National Collegiate Athletic Assn.* v. *Smith*, 525 U. S. 459, 470 (1999). In particular, when we reverse on a threshold question, we typically remand for resolution of any claims the lower courts' error prevented them from addressing. See, *e.g., Bond* v. *United States*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 1–2) (reversing the Court of Appeals' determination on standing and remanding because the "merits of petitioner's challenge to the statute's validity are to be considered, in the first instance, by the Court of Appeals"). We see no reason to depart from this approach in this case. Having determined that this case is justiciable, we leave it to the lower courts to consider the merits in the first instance.

The judgment of the Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 10–699

————

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS
AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY, PETITIONER *v.* HILLARY
RODHAM CLINTON, SECRETARY
OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 26, 2012]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins
as to Part I, concurring in part and concurring in the
judgment.

As this case illustrates, the proper application of *Baker*'s
six factors has generated substantial confusion in the
lower courts. I concur in the Court's conclusion that this
case does not present a political question. I write sepa-
rately, however, because I understand the inquiry re-
quired by the political question doctrine to be more de-
manding than that suggested by the Court.

I

The political question doctrine speaks to an amalgam of
circumstances in which courts properly examine whether
a particular suit is justiciable—that is, whether the dis-
pute is appropriate for resolution by courts. The doctrine
is "essentially a function of the separation of powers,"
*Baker* v. *Carr*, 369 U. S. 186, 217 (1962), which recognizes
the limits that Article III imposes upon courts and accords
appropriate respect to the other branches' exercise of their
own constitutional powers.

In *Baker*, this Court identified six circumstances in

which an issue might present a political question: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving it"; (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*, at 217. *Baker* established that "[u]nless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability." *Ibid.* But *Baker* left unanswered when the presence of one or more factors warrants dismissal, as well as the interrelationship of the six factors and the relative importance of each in determining whether a case is suitable for adjudication.

In my view, the *Baker* factors reflect three distinct justifications for withholding judgment on the merits of a dispute. When a case would require a court to decide an issue whose resolution is textually committed to a coordinate political department, as envisioned by *Baker*'s first factor, abstention is warranted because the court lacks authority to resolve that issue. See, *e.g., Nixon* v. *United States*, 506 U. S. 224, 229 (1993) (holding nonjusticiable the Senate's impeachment procedures in light of Article I's commitment to the Senate of the "'sole Power to try all Impeachments'"); see also *Marbury* v. *Madison*, 1 Cranch 137, 165–166 (1803) ("By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience"). In

such cases, the Constitution itself requires that another branch resolve the question presented.

The second and third *Baker* factors reflect circumstances in which a dispute calls for decisionmaking beyond courts' competence. "'The judicial Power' created by Article III, §1, of the Constitution is not *whatever* judges choose to do," but rather the power "to act in the manner traditional for English and American courts." *Vieth* v. *Jubelirer*, 541 U. S. 267, 278 (2004) (plurality opinion). That traditional role involves the application of some manageable and cognizable standard within the competence of the Judiciary to ascertain and employ to the facts of a concrete case. When a court is given no standard by which to adjudicate a dispute, or cannot resolve a dispute in the absence of a yet-unmade policy determination charged to a political branch, resolution of the suit is beyond the judicial role envisioned by Article III. See, *e.g., Gilligan* v. *Morgan*, 413 U. S. 1, 10 (1973) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence" than "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force"); *Vieth*, 541 U. S., at 278 ("One of the most obvious limitations imposed by [Article III] is that judicial action must be governed by *standard* . . . "). This is not to say, of course, that courts are incapable of interpreting or applying somewhat ambiguous standards using familiar tools of statutory or constitutional interpretation. But where an issue leaves courts truly rudderless, there can be "no doubt of [the] validity" of a court's decision to abstain from judgment. *Ibid.*

The final three *Baker* factors address circumstances in which prudence may counsel against a court's resolution of an issue presented. Courts should be particularly cautious before forgoing adjudication of a dispute on the basis that judicial intervention risks "embarrassment from multifar-

ious pronouncements by various departments on one question," would express a "lack of the respect due coordinate branches of government," or because there exists an "unusual need for unquestioning adherence to a political decision already made." 369 U. S., at 217. We have repeatedly rejected the view that these thresholds are met whenever a court is called upon to resolve the constitutionality or propriety of the act of another branch of Government. See, *e.g., United States* v. *Munoz-Flores*, 495 U. S. 385, 390–391 (1990); *Powell* v. *McCormack*, 395 U. S. 486, 548, 549 (1969). A court may not refuse to adjudicate a dispute merely because a decision "may have significant political overtones" or affect "the conduct of this Nation's foreign relations," *Japan Whaling Assn.* v. *American Cetacean Soc.*, 478 U. S. 221, 230 (1986). Nor may courts decline to resolve a controversy within their traditional competence and proper jurisdiction simply because the question is difficult, the consequences weighty, or the potential real for conflict with the policy preferences of the political branches. The exercise of such authority is among the "gravest and most delicate dut[ies] that this Court is called on to perform," *Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (Holmes, J., concurring), but it is the role assigned to courts by the Constitution. "Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821).

Rare occasions implicating *Baker*'s final factors, however, may present an "'unusual case'" unfit for judicial disposition. 369 U. S., at 218 (quoting the argument of Daniel Webster in *Luther* v. *Borden*, 7 How. 1, 29 (1849)). Because of the respect due to a coequal and independent department, for instance, courts properly resist calls to question the good faith with which another branch attests to the authenticity of its internal acts. See, *e.g., Field* v.

*Clark*, 143 U. S. 649, 672–673 (1892) (deeming "forbidden by the respect due to a coordinate branch of the government" "[j]udicial action" requiring a belief in a "deliberate conspiracy" by the Senate and House of Representatives "to defeat an expression of the popular will"); see also *Munoz-Flores*, 495 U. S., at 409–410 (SCALIA, J., concurring in judgment) ("Mutual regard between the coordinate branches, and the interest of certainty, both demand that official representations regarding . . . matters of internal process be accepted at face value"). Likewise, we have long acknowledged that courts are particularly ill suited to intervening in exigent disputes necessitating unusual need for "attributing finality to the action of the political departments," *Coleman* v. *Miller*, 307 U. S. 433, 454 (1939), or creating acute "risk [of] embarrassment of our government abroad, or grave disturbance at home," *Baker*, 369 U. S., at 226. See, *e.g., Luther*, 7 How., at 43 ("After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? . . . If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order").[1] Finally, it may be appropriate for courts to stay their hand in cases implicating delicate questions concerning the distribution of political authority between coordinate branches until a dispute is ripe, intractable, and incapable of resolution by the political process. See

---

[1] See also *Martin* v. *Mott*, 12 Wheat. 19, 29–30 (1827) (Story, J.) (declining to review the President's determination that an "exigency has arisen," necessitating the "call [of] the militia into actual service," recognizing need for "[a] prompt and unhesitating obedience to orders is indispensable"); *Ware* v. *Hylton*, 3 Dall. 199, 260 (1796) (Iredell, J., concurring) (to declare treaty with Great Britain void would turn on "considerations of policy, considerations of extreme magnitude, [which are] certainly entirely incompetent to the examination and decision of a Court of Justice").

*Goldwater* v. *Carter*, 444 U. S. 996, 997 (1979) (Powell, J., concurring in judgment). Abstention merely reflects that judicial intervention in such cases is "legitimate only in the last resort," *Chicago & Grand Trunk R. Co.* v. *Wellman*, 143 U. S. 339, 345 (1892), and is disfavored relative to the prospect of accommodation between the political branches.

When such unusual cases arise, abstention accommodates considerations inherent in the separation of powers and the limitations envisioned by Article III, which conferred authority to federal courts against a common-law backdrop that recognized the propriety of abstention in exceptional cases. *New Orleans Public Service, Inc.* v. *Council of City of New Orleans*, 491 U. S. 350, 359 (1989); see generally Shapiro, Jurisdiction and Discretion, 60 N. Y. U. L. Rev. 543 (1985) (hereinafter Shapiro). The political questions envisioned by *Baker*'s final categories find common ground, therefore, with many longstanding doctrines under which considerations of justiciability or comity lead courts to abstain from deciding questions whose initial resolution is better suited to another time, see, *e.g., National Park Hospitality Assn.* v. *Department of Interior*, 538 U. S. 803, 808 (2003) (ripeness); *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 397 (1980) (mootness); or another forum, see, *e.g., Gulf Oil Corp.* v. *Gilbert*, 330 U. S. 501, 507 (1947) *(forum non conveniens); Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496, 498–500 (1941); *Louisiana Power & Light Co.* v. *City of Thibodaux*, 360 U. S. 25, 25–30 (1959); *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 333–334 (1943) (abstention in favor of a state forum); *United States* v. *Western Pacific R. Co.*, 352 U. S. 59, 63–64 (1956) (primary jurisdiction doctrine). See also *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language"); Shapiro 550–557, 580–

587 (describing practices of judicial abstention sounding in justiciability, comity, *forum non conveniens*, and separation of powers).

To be sure, it will be the rare case in which *Baker*'s final factors alone render a case nonjusticiable.[2]  But our long historical tradition recognizes that such exceptional cases arise, and due regard for the separation of powers and the judicial role envisioned by Article III confirms that abstention may be an appropriate response.

## II

The court below held that this case presented a political question because it thought petitioner's suit asked the court to decide an issue "textually committed" to a coordinate branch—namely, "to review a policy of the State Department implementing the President's decision" to keep the United States out of the debate over the status of Jersualem.   571 F. 3d 1227, 1231–1232 (CADC 2009). Largely for the reasons set out by the Court, I agree that the Court of Appeals misapprehended the nature of its task.  In two respects, however, my understanding of the political question doctrine might require a court to engage in further analysis beyond that relied upon by the Court.

*First*, the Court appropriately recognizes that petitioner's claim to a statutory right is "relevant" to the justiciability inquiry required in this case.  *Ante,* at 6.  In order to evaluate whether a case presents a political question, a court must first identify with precision the issue it is being

———————

[2] Often when such factors are implicated in a case presenting a political question, other factors identified in *Baker* will likewise be apparent. See, *e.g., Nixon* v. *United States*, 506 U. S. 224, 236 (1993) ("[i]n addition to the textual commitment argument," finding persuasive that "opening the door of judicial review" of impeachment procedures would "'expose the political life of the country to months, or perhaps years, of chaos'"); *Baker*, 369 U. S., at 222 (explaining that the Court in *Luther* v. *Borden*, 7 How. 1 (1849), found present features associated with each of the three rationales underlying *Baker*'s factors).

asked to decide.   Here, petitioner's suit claims that a
federal statute provides him with a right to have "Israel"
listed as his place of birth on his passport and other re-
lated documents.  App. 15–18.  To decide that question, a
court must determine whether the statute is constitu-
tional, and therefore mandates the Secretary of State to
issue petitioner's desired passport, or unconstitutional, in
which case his suit is at an end.  Resolution of that issue is
not one "textually committed" to another branch; to the
contrary, it is committed to this one.  In no fashion does the
question require a court to review the wisdom of the Pres-
ident's policy toward Jerusalem or any other decision
committed to the discretion of a coordinate department.
For that reason, I agree that the decision below should be
reversed.

   That is not to say, however, that no statute could give
rise to a political question.  It is not impossible to imagine
a case involving the application or even the constitutional-
ity of an enactment that would present a nonjusticiable
issue.  Indeed, this Court refused to determine whether an
Ohio state constitutional provision offended the Repub-
lican Guarantee Clause, Art. IV, §4, holding that "the
question of whether that guarantee of the Constitution
has been disregarded presents no justiciable controversy."
*Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565, 569 (1916).
A similar result would follow if Congress passed a statute,
for instance, purporting to award financial relief to those
improperly "tried" of impeachment offenses.  To adjudicate
claims under such a statute would require a court to re-
solve the very same issue we found nonjusticiable in
*Nixon*.  Such examples are atypical, but they suffice to show
that the foreclosure altogether of political question analy-
sis in statutory cases is unwarranted.

   *Second*, the Court suggests that this case does not im-
plicate the political question doctrine's concern with issues
exhibiting "'a lack of judicially discoverable and managea-

ble standards,'" *ante*, at 8, because the parties' arguments rely on textual, structural, and historical evidence of the kind that courts routinely consider. But that was equally true in *Nixon*, a case in which we found that "the use of the word 'try' in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review of the Senate's actions." 506 U. S., at 230. We reached that conclusion even though the parties' briefs focused upon the text of the Impeachment Trial Clause, "the Constitution's drafting history," "contemporaneous commentary," "the unbroken practice of the Senate for 150 years," contemporary dictionary meanings, "Hamilton's Federalist essays," and the practice in the House of Lords prior to ratification. Such evidence was no more or less unfamiliar to courts than that on which the parties rely here.

In my view, it is not whether the evidence upon which litigants rely is common to judicial consideration that determines whether a case lacks judicially discoverable and manageable standards. Rather, it is whether that evidence in fact provides a court a basis to adjudicate meaningfully the issue with which it is presented. The answer will almost always be yes, but if the parties' textual, structural, and historical evidence is inapposite or wholly unilluminating, rendering judicial decision no more than guesswork, a case relying on the ordinary kinds of arguments offered to courts might well still present justiciability concerns.

In this case, however, the Court of Appeals majority found a political question solely on the basis that this case required resolution of an issue "textually committed" to the Executive Branch. Because there was no such textual commitment, I respectfully concur in the Court's decision to reverse the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–699

_____

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS
AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY, PETITIONER *v.* HILLARY
RODHAM CLINTON, SECRETARY
OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 26, 2012]

JUSTICE ALITO, concurring in the judgment.

This case presents a narrow question, namely, whether the statutory provision at issue infringes the power of the President to regulate the contents of a passport. This case does not require the Judiciary to decide whether the power to recognize foreign governments and the extent of their territory is conferred exclusively on the President or is shared with Congress. Petitioner does not claim that the statutory provision in question represents an attempt by Congress to dictate United States policy regarding the status of Jerusalem. Instead, petitioner contends in effect that Congress has the power to mandate that an American citizen born abroad be given the option of including in his passport and Consular Report of Birth Abroad (CRBA) what amounts to a statement of personal belief on the status of Jerusalem.

Powers conferred on Congress by the Constitution certainly give Congress a measure of authority to prescribe the contents of passports and CRBAs. The Constitution gives Congress the power to regulate foreign commerce, Art. I, §8, cl. 3, and this power includes the power to regulate the entry of persons into this country, see *Henderson*

v. *Mayor of New York*, 92 U. S. 259, 270–271 (1876). The Constitution also gives Congress the power to make a "uniform Rule of Naturalization," Art. I, §8, cl. 4, and pursuant to this power, Congress has enacted laws concerning the citizenship of children born abroad to parents who are citizens of this country, see *United States* v. *Wong Kim Ark*, 169 U. S. 649, 688 (1898). These powers allow Congress to mandate that identifying information be included in passports and CRBAs.

The President also has a measure of authority concerning the contents of passports and CRBAs. The President has broad authority in the field of foreign affairs, see, *e.g., American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 414 (2003), and, historically, that authority has included the power to issue passports, even in the absence of any formal congressional conferral of authority to do so. See *Haig* v. *Agee*, 453 U. S. 280, 293 (1981) (explaining that "[p]rior to 1856, when there was no statute on the subject, the common perception was that the issuance of a passport was committed to the sole discretion of the Executive and that the Executive would exercise this power in the interests of the national security and foreign policy of the United States"). We have described a passport as "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Id.,* at 292. This is apparent from the first page of petitioner's passport, which reads as follows:

> "The Secretary of State of the United States of America hereby requests all whom it may concern to permit the citizen / national of the United States named herein to pass without delay or hindrance and in case of need to give all lawful aid and protection." App. 19.

Similarly, a CRBA is a certification made by a consular official that the bearer acquired United States citizenship at birth. See *id.,* at 20.

ALITO, J., concurring in judgment

Under our case law, determining the constitutionality of an Act of Congress may present a political question, but I do not think that the narrow question presented here falls within that category.  Delineating the precise dividing line between the powers of Congress and the President with respect to the contents of a passport is not an easy matter, but I agree with the Court that it does not constitute a political question that the Judiciary is unable to decide.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–699

_____

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS
AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY, PETITIONER *v.* HILLARY
RODHAM CLINTON, SECRETARY
OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 26, 2012]

JUSTICE BREYER, dissenting.

I join Part I of JUSTICE SOTOMAYOR's opinion. As she points out, *Baker* v. *Carr*, 369 U. S. 186 (1962), set forth several categories of legal questions that the Court had previously held to be "political questions" inappropriate for judicial determination. Those categories include (1) instances in which the Constitution clearly commits decisionmaking power to another branch of Government, and (2) issues lacking judicially manageable standards for resolution. *Id.*, at 217. They also include (3) issues that courts cannot decide without making "an initial policy determination of a kind clearly for nonjudicial discretion," (4) issues that a court cannot independently decide "without expressing lack of the respect due coordinate branches of government," (5) cases in which there is "an unusual need for unquestioning adherence to a political decision already made," and (6) cases in which there is a potential for "embarrassment from multifarious pronouncements by various departments on one question." *Ibid.*

As JUSTICE SOTOMAYOR also points out, these categories (and in my view particularly the last four) embody "circumstances in which prudence may counsel against a

court's resolution of an issue presented." *Ante,* at 3 (opinion concurring in part and concurring in judgment); see *Nixon* v. *United States,* 506 U. S. 224, 253 (1993) (Souter, J., concurring in judgment) (the political-question doctrine "deriv[es] in large part from prudential concerns about the respect we owe the political departments"); *Goldwater* v. *Carter,* 444 U. S. 996, 1000 (1979) (Powell, J., concurring in judgment) ("[T]he political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government"); see also Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265, 1304 (1961) (prudence counsels hesitation where a legal issue is "felt to be so closely related to a complex of decisions not within the court's jurisdiction that its resolution by the court would either be poor in itself or would jeopardize sound decisions in the larger complex").

JUSTICE SOTOMAYOR adds that the circumstances in which these prudential considerations lead the Court not to decide a case otherwise properly before it are rare. *Ante,* at 7. I agree. But in my view we nonetheless have before us such a case. Four sets of prudential considerations, *taken together*, lead me to that conclusion.

First, the issue before us arises in the field of foreign affairs. (Indeed, the statutory provision before us is a subsection of a section that concerns the relation between Jerusalem and the State of Israel. See §214 of the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1365 ("United States Policy with Respect to Jerusalem as the Capital of Israel").) The Constitution primarily delegates the foreign affairs powers "to the political departments of the government, Executive and Legislative," not to the Judiciary. *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 111 (1948); see also *Marbury* v. *Madison,* 1 Cranch 137, 166 (1803) (noting discretionary foreign affairs functions of Secretary of State

as beyond the power of the Judiciary to review). And that
fact is not surprising. Decisionmaking in this area typical-
ly is highly political. It is "delicate" and "complex." *Chi-
cago & Southern Air Lines*, 333 U. S*.,* at 111. It often
rests upon information readily available to the Executive
Branch and to the intelligence committees of Congress,
but not readily available to the courts. *Ibid.* It frequently
is highly dependent upon what Justice Jackson called
"prophecy." *Ibid.* And the creation of wise foreign policy
typically lies well beyond the experience or professional
capacity of a judge. *Ibid.* At the same time, where foreign
affairs is at issue, the practical need for the United States
to speak "with one voice and ac[t] as one," is particularly
important. See *United States* v. *Pink*, 315 U. S. 203, 242
(1942) (Frankfurter, J., concurring); see also R. Fallon,
J. Manning, D. Meltzer, & D. Shapiro, Hart and
Wechsler's The Federal Courts and the Federal System
240 (6th ed. 2009).

The result is a judicial hesitancy to make decisions that
have significant foreign policy implications, as reflected in
the fact that many of the cases in which the Court has in-
voked the political-question doctrine have arisen in this
area, *e.g.,* cases in which the validity of a treaty depended
upon the partner state's constitutional authority, *Doe* v.
*Braden*, 16 How. 635, 657 (1854), or upon its continuing
existence, *Terlinden* v. *Ames*, 184 U. S. 270, 285 (1902);
cases concerning the existence of foreign states, govern-
ments, belligerents, and insurgents, *Oetjen* v. *Central
Leather Co.*, 246 U. S. 297, 302 (1918); *United States* v.
*Klintock*, 5 Wheat. 144, 149 (1820); *United States* v. *Pal-
mer*, 3 Wheat. 610, 634–635 (1818); and cases concerning
the territorial boundaries of foreign states, *Williams* v.
*Suffolk Ins. Co.*, 13 Pet. 415, 420 (1839); *Foster* v. *Neilson*,
2 Pet. 253, 307 (1829). See *Baker, supra,* at 186, 211–213
(citing these cases as the Court's principal foreign-
relations political-question cases); see also Fallon, *supra,*

at 243–247.

Second, if the courts must answer the constitutional question before us, they may well have to evaluate the foreign policy implications of foreign policy decisions. The constitutional question focuses upon a statutory provision, §214(d), that says: The Secretary of State, upon the request of a U. S. citizen born in Jerusalem (or upon the request of the citizen's legal guardian), shall "record" in the citizen's passport or consular birth report "the place of birth as Israel." 116 Stat. 1366. And the question is whether this statute unconstitutionally seeks to limit the President's inherent constitutional authority to make certain kinds of foreign policy decisions. See *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 414–415 (2003) (citing cases); *Clinton* v. *City of New York*, 524 U. S. 417, 445 (1998) ("[T]his Court has recognized that in the foreign affairs arena, the President has 'a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved'" (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936))); cf. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637–638 (1952) (Jackson, J., concurring).

The Secretary of State argues that the President's constitutional authority to determine foreign policy includes the power to recognize foreign governments, that this Court has long recognized that the latter power belongs to the President exclusively, that the power includes the power to determine claims over disputed territory as well as the policy governing recognition decisions, and that the statute unconstitutionally limits the President's exclusive authority to exercise these powers. See U. S. Const., Art. II, §2, cl. 2; Art. II, §3; *e.g., Kennett* v. *Chambers*, 14 How. 38, 50–51 (1852) (recognition); *Williams, supra,* at 420 (disputed territory); *Pink, supra,* at 229 (recognition policy); see also *Haig* v. *Agee*, 453 U. S. 280, 293 (1981) (execu-

tive passport authority).

Zivotofsky, supported by several Members of Congress, points out that the Constitution also grants Congress powers related to foreign affairs, such as the powers to declare war, to regulate foreign commerce, and to regulate naturalization. See Art. I, §8, cls. 3, 4, 11; see also *American Ins. Assn., supra,* at 414. They add that Congress may share some of the recognition power and its attendant power of determining claims over disputed territory. *E.g., Palmer, supra,* at 634 (recognition); *Jones* v. *United States*, 137 U. S. 202, 212 (1890) (disputed territory). And they add that Congress may enact laws concerning travel into this country and concerning the citizenship of children born abroad to U. S. citizens. See *Henderson* v. *Mayor of New York*, 92 U. S. 259, 270–271 (1876) (travel); *Fong Yue Ting* v. *United States*, 149 U. S. 698, 714 (1893) (immigration); *United States* v. *Wong Kim Ark*, 169 U. S. 649, 688 (1898) (citizenship). They argue that these powers include the power to specify the content of a passport (or consular birth report). And when such a specification takes the form of statutory law, they say, the Constitution requires the President (through the Secretary of State) to execute that statute. See Art. II, §3.

Were the statutory provision undisputedly concerned only with purely administrative matters (or were its enforcement undisputedly to involve only major foreign policy matters), judicial efforts to answer the constitutional question might not involve judges in trying to answer questions of foreign policy. But in the Middle East, administrative matters can have implications that extend far beyond the purely administrative. Political reactions in that region can prove uncertain. And in that context it may well turn out that resolution of the constitutional argument will require a court to decide how far the statute, in practice, reaches beyond the purely administrative, determining not only whether but also the extent to

which enforcement will interfere with the President's ability to make significant recognition-related foreign policy decisions.

Certainly the parties argue as if that were so. Zivotofsky, for example, argues that replacing "Jerusalem" on his passport with "Israel" will have no serious foreign policy significance. See Brief for Petitioner 43, 46–52; Reply Brief for Petitioner 25–26. And in support he points to (1) a State Department official's statement that birthplace designation serves primarily as "an element of identification," while omitting mention of recognition; (2) the fact that the State Department has recorded births in unrecognized territories in the region, such as the Gaza Strip and the West Bank, apparently without adverse effect; and (3) the fact that sometimes Jerusalem does (because of what the Government calls "clerical errors") carry with it the name of "Israel" on certain official documents, again apparently without seriously adverse effect. See Brief for Petitioner 7–10, 15, 43, 50; App. 50, 58–60, 75–76. Moreover, Zivotofsky says, it is unfair to allow the 100,000 or so Americans born in cities that the United States recognizes as under Israeli sovereignty, such as Tel Aviv or Haifa, the right to a record that mentions Israel, while denying that privilege to the 50,000 or so Americans born in Jerusalem. See Brief for Petitioner 18–20, 48–49; App. 48.

At the same time, the Secretary argues that listing Israel on the passports (and consular birth reports) of Americans born in Jerusalem will have significantly adverse foreign policy effects. See Brief for Respondent 8, 37–41. She says that doing so would represent "'an official decision by the United States to begin to treat Jerusalem as a city located within Israel,'" *id.,* at 38–39, that it "would be interpreted as an official act of recognizing Jerusalem as being under Israeli sovereignty," App. 56, and that our "national security interests" consequently

"would be significantly harmed," *id.,* at 49.  Such an action, she says, "'would signal, symbolically or concretely, that'" the United States "'recognizes that Jerusalem is a city that is located within the sovereign territory of Israel,'" and doing so, "'would critically compromise the ability of the United States to work with Israelis, Palestinians and others in the region to further the peace process.'" Brief for Respondent 2; App. 52–53.  She adds that the very enactment of this statutory provision in 2002 produced headlines in the Middle East stating the "the U. S. now recognizes Jerusalem as Israel's capital." *Id.,* at 231; Brief for Respondent 10; see also App. 53–55, 227–231.

A judge's ability to evaluate opposing claims of this kind is minimal.  At the same time, a judicial effort to do so risks inadvertently jeopardizing sound foreign policy decisionmaking by the other branches of Government. How, for example, is this Court to determine whether, or the extent to which, the continuation of the adjudication that it now orders will itself have a foreign policy effect?

Third, the countervailing interests in obtaining judicial resolution of the constitutional determination are not particularly strong ones.  Zivotofsky does not assert the kind of interest, *e.g.,* an interest in property or bodily integrity, which courts have traditionally sought to protect.  See, *e.g., Ingraham* v. *Wright,* 430 U. S. 651, 673–674 (1977) (enduring commitment to legal protection of bodily integrity).  Nor, importantly, does he assert an interest in vindicating a basic right of the kind that the Constitution grants to individuals and that courts traditionally have protected from invasion by the other branches of Government.  And I emphasize this fact because the need for judicial action in such cases can trump the foreign policy concerns that I have mentioned.  As Professor Jaffe pointed out many years ago, "Our courts would not refuse to entertain habeas corpus to test the constitutionality of the imprisonment of an alleged Chinese agent even if it

were clear that his imprisonment was closely bound up with our relations to the Chinese government." 74 Harv. L. Rev., at 1304; see also T. Franck, Political Questions/ Judicial Answers 63–64 (1992); cf. *Boumediene* v. *Bush*, 553 U. S. 723, 755 (2008).

The interest that Zivotofsky asserts, however, is akin to an ideological interest. See Brief for Petitioner 54 (citizen born in Jerusalem, unlike citizen born in Tel Aviv or Haifa, does not have the "option" to "specify or suppress the name of a country that accords with his or her ideology"); see also *id.*, at 19 (State Department policy bars citizens born in Jerusalem "from identifying their birthplace in a manner that conforms with their convictions"). And insofar as an individual suffers an injury that is purely ideological, courts have often refused to consider the matter, leaving the injured party to look to the political branches for protection. *E.g., Diamond* v. *Charles*, 476 U. S. 54, 66–67 (1986); *Sierra Club* v. *Morton*, 405 U. S. 727, 739–740 (1972). This is not to say that Zivotofsky's claim is unimportant or that the injury is not serious or even that it is purely ideological. It is to point out that those suffering somewhat similar harms have sometimes had to look to the political branches for resolution of relevant legal issues. Cf. *United States* v. *Richardson*, 418 U. S. 166, 179 (1974); *Laird* v. *Tatum*, 408 U. S. 1, 15 (1972).

Fourth, insofar as the controversy reflects different foreign policy views among the political branches of Government, those branches have nonjudicial methods of working out their differences. Cf. *Goldwater*, 444 U. S., at 1002, 1004 (Rehnquist, J., joined by Burger, C. J., and Stewart and Stevens, JJ., concurring in judgment) (finding in similar fact strong reason for Judiciary not to decide treaty power question). The Executive and Legislative Branches frequently work out disagreements through ongoing contacts and relationships, involving, for example, budget authorizations, confirmation of personnel, commit-

tee hearings, and a host of more informal contacts, which, taken together, ensure that, in practice, Members of Congress as well as the President play an important role in the shaping of foreign policy. Indeed, both the Legislative Branch and the Executive Branch typically understand the need to work each with the other in order to create effective foreign policy. In that understanding, those related contacts, and the continuous foreign policy-related relationship lies the possibility of working out the kind of disagreement we see before us. Moreover, if application of the political-question "doctrine ultimately turns, as Learned Hand put it, on 'how importunately the occasion demands an answer,'" *Nixon*, 506 U. S., at 253 (Souter, J., concurring in judgment) (quoting L. Hand, The Bill of Rights 15 (1958)), the ability of the political branches to work out their differences minimizes the need for judicial intervention here.

The upshot is that this case is unusual both in its minimal need for judicial intervention and in its more serious risk that intervention will bring about "embarrassment," show lack of "respect" for the other branches, and potentially disrupt sound foreign policy decisionmaking. For these prudential reasons, I would hold that the political-question doctrine bars further judicial consideration of this case. And I would affirm the Court of Appeals' similar conclusion.

With respect, I dissent.